# In re S-A-, Respondent

*Decided as amended June 27, 2000*[1]

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

A woman with liberal Muslim beliefs established by credible evidence that she suffered past persecution and has a well-founded fear of future persecution at the hands of her father on account of her religious beliefs, which differ from her father's orthodox Muslim views concerning the proper role of women in Moroccan society.

Millicent Y. Clarke, Esquire, Freeport, New York, for respondent

Irene C. Feldman, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board Panel: VACCA, HURWITZ, and MILLER, Board Members.

HURWITZ, Board Member:

In a decision dated May 21, 1998, an Immigration Judge found the respondent inadmissible and removable under sections 212(a)(6)(C)(i) and (7)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(6)(C)(i) and (7)(A)(i)(I) (1994 & Supp. IV 1998). In addition, the Immigration Judge denied the respondent's application for asylum and withholding of removal under sections 208(a) and 241(b)(3) of the Act, 8 U.S.C. §§ 1158(a) and 1231(b)(3) (Supp. IV 1998). The respondent filed a timely appeal. The appeal will be sustained. The request for oral argument is denied. 8 C.F.R. § 3.1(e) (2000).

The respondent's brief was submitted after the filing deadline and was accompanied by a motion to accept the late-filed brief. The motion is granted. However, we do not consider on appeal the evidence that the respondent submitted in conjunction with her brief. *See Matter of Fedorenko*, 19 I&N Dec. 57, 74 (BIA 1984) ("[A]ll evidence which is pertinent to determina-

---

[1] On our own motion, we amend the August 6, 1999, order in this case. The amended order makes editorial changes consistent with our designation of the case as a precedent.

tions made during deportation proceedings . . . must be adduced in the hearing before the immigration judge. The Board is an appellate body whose function is to review, not to create, a record." (footnote omitted)).

## I. BACKGROUND

The respondent is a native and citizen of Morocco, who is either 20 or 21 years old. She testified that she was schooled for 3 years and knows how to write her name, but she is otherwise illiterate.

The respondent claims that in Morocco she was a victim of her father's escalating physical and emotional abuse. According to the respondent, the abuse arose primarily out of religious differences between her and her father, i.e., the father's orthodox Muslim beliefs, particularly pertaining to women, and her liberal Muslim views. Her father beat her a minimum of once a week using his hands, his feet, or a belt. She notes that her father did not mistreat her two brothers.

The respondent related that when she was about 14 years old, her maternal aunt, who is a United States citizen and resides in this country, sent her a somewhat short skirt. On one occasion the respondent wore the skirt outside her home. Upon returning home, her father verbally reprimanded her, heated a straight razor, and burned those portions of her thighs that had been exposed while she was wearing the skirt. He told her that he was taking this action to scar her thighs so that, in the future, she would not be tempted to wear what he considered improper attire. The respondent stated that she and her mother were afraid to go to the hospital after the incident, so her mother went to the local pharmacy and procured an ointment to treat the burns.

On another occasion, the respondent went to a pay phone to call her aunt in the United States. She explained that family members used a pay phone located near her parents' home because the family did not receive telephone service. On her way to the telephone, a young man stopped the respondent to ask for directions and she engaged in a short dialogue with the man. Upon observing this interchange, her father came into the street, shouted at her and the individual with whom she was conversing, and beat both of them. He used a ring he was wearing to beat the respondent in the face, particularly her forehead, the area between her eyebrows, and the bridge and top of her nose. She testified that she bled from the beating. Thereafter, the respondent's father compelled her to remain in the house in order to prevent subsequent casual conversations with strangers. She was forbidden to attend school and was prohibited from other activities physically located outside her home. The respondent stated that her father believes that "a girl should stay at home and should be covered or veiled all the time."

One evening in 1997 the respondent sneaked out of the house to visit some girl friends. That night while she was asleep, her father entered her bedroom and asked whether she had gone out that day. Knowing that he had forbidden her to leave the house, the respondent lied about her outing. Her father showed her that, unbeknownst to her, he had been marking the soles of her shoes with chalk and was thereby monitoring her activities. He said that he knew she had left the house and had lied about it. He then slapped, punched, and kicked her and pulled her hair.

The respondent stated that she did not consider requesting police protection or seeking any other kind of governmental intervention because her mother's previous efforts in that regard had proven unproductive. According to the respondent, she twice attempted to commit suicide in Morocco, and on two other occasions she attempted to run away in an effort to escape her circumstances. After at least one of the suicide attempts, she had her stomach pumped in a hospital and was unconscious for 3 days.

The respondent testified that during one of her aunt's visits to Morocco, she took a picture of the respondent. Her aunt later showed the picture to a man in the United States. A long-distance relationship developed, culminating in an offer of marriage. Although the respondent's fiancé died prior to their planned marriage, her prospective brother-in-law forwarded documents to her in an effort to assist her entry to the United States. The respondent stated that she understood such documents to be a valid Social Security card and resident alien card. The respondent claimed that after she received her passport and the above documents, her mother sold some of her jewelry and bought the respondent an airline ticket to the United States.

The respondent's maternal aunt testified on her behalf at the hearing. The aunt stated that she has weekly telephonic contact with her sister, the respondent's mother, and that she visits Morocco once a year. She testified that the respondent's father is

> very strict, he's Muslim . . . [and he] is very tough when it comes to the religion, so he wants [the respondent] to . . . wear . . . the long robe to cover her face with the veil and when she . . . doesn't listen to him, . . . he abuse her, he beat her up . . . because he said that his daughter, he want her to be Muslim girl, like to follow the Islam.

Claiming to have actually observed some of the beatings, the respondent's aunt stated that the respondent's father

> pull her hair, he kick her, sometime he punch her in the face, like for no excuse, just because she's like, she's putting lipstick or she's putting hair color in her hair or she's looking from the window or she's talking to any girls, he doesn't like her to talk to them or the way she dress.

According to the aunt, going to the police would have been futile, because under Muslim law, particularly in Morocco, a father's power over his daughter is unfettered. In conformity with his fundamentalist Muslim

beliefs, the respondent's father severely limited her access to education and compelled her to stay in the home. Moreover, because the respondent left her country to come to the United States and traveled without the approval or supervision of a male family member, she violated the edicts of the father's orthodox Muslim beliefs and he would kill her if she were to be returned to Morocco.

The respondent's aunt testified that she had not known about the respondent's suicide attempts, which occurred in Morocco. The record contains documentation concerning two additional suicide attempts during the respondent's detention in the United States, one involving a medication overdose and the other the ingestion of laundry bleach.

## II. CREDIBILITY

We consider the issue of credibility as a threshold matter, because the Immigration Judge made an adverse credibility finding. It is our general practice to defer to and adopt an Immigration Judge's determination regarding an alien's credibility. *See, e.g.*, *Matter of A-S-*, 21 I&N Dec. 1106 (BIA 1998); *Matter of Burbano*, 20 I&N Dec. 872 (BIA 1994); *Matter of Kulle*, 19 I&N Dec. 318 (BIA 1995), *aff'd*, 825 F.2d 1188 (7th Cir. 1987), *cert. denied*, 484 U.S. 1041 (1988). However, we find it appropriate to depart from that practice in this case.

We recently articulated a three-pronged approach to assessing an Immigration Judge's credibility findings. *Matter of A-S-*, *supra*. We held that we will generally defer to an adverse credibility determination based on inconsistencies and omissions regarding events central to an alien's asylum claim where a review of the record reveals that (1) the discrepancies and omissions described by the Immigration Judge are actually present in the record; (2) such discrepancies and omissions provide specific and cogent reasons to conclude that the alien provided incredible testimony; and (3) the alien has failed to provide a convincing explanation for the discrepancies and omissions. *Id.* at 1109; *see also, e.g.*, *Paredes-Urrestarazu v. INS*, 36 F.3d 801 (9th Cir. 1994) (upholding the Board's adoption of an Immigration Judge's adverse credibility finding because it was supported by specific and cogent reasons); *Berroteran-Melendez v. INS*, 955 F.2d 1251, 1256 (9th Cir. 1992) (citing *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir. 1987)); *Damaize-Job v. INS*, 787 F.2d 1332, 1338 (9th Cir. 1986) (holding that a trier of fact who rejects a witness's positive testimony because, in his or her judgment, it lacks credibility should offer specific, cogent reasons for such disbelief); *Chen v. Slattery*, 862 F. Supp. 814, 823 (E.D.N.Y. 1994) (relying on *Vilorio-Lopez v. INS*, 852 F.2d 1137, 1141 (9th Cir. 1988), for the proposition that an Immigration Judge must underpin adverse credibility findings with "a 'specific, cogent reason'"). In applying the test articulated in

*Matter of A-S-*, *supra*, we have found that the pertinent discrepancies most often exist either between an alien's testimony and his or her Application for Asylum and Withholding of Removal (Form I-589), or between the testimony offered during direct examination and that in cross-examination.

We observe that the Immigration Judge's adverse credibility finding in this case did not specify any internal discrepancies in the respondent's testimony. The Immigration Judge also did not identify any discrepancies between the respondent's testimony and her Form I-589. Moreover, the Immigration Judge failed to point to any differences between the respondent's testimony and that offered by her aunt, except to note suspicion regarding the aunt's lack of awareness of the respondent's alleged suicide attempts. In her decision the Immigration Judge stated that she accorded "little weight" to the aunt's testimony, characterizing it as the respondent's attempt "to embellish her claim." Having reviewed the record, we find that the discrepancies identified by the Immigration Judge are not actually present.

Furthermore, we find that the Immigration Judge's credibility finding is not supported by specific and cogent reasons. *See, e.g.*, *Vilorio-Lopez v. INS*, *supra*; *Matter of A-S-*, *supra.* We therefore decline to defer to the Immigration Judge's determination because we conclude that the respondent's claim is sufficiently detailed, believable, and consistent. For example, the accounts in the Form I-589 of the burning episode are corroborated by the respondent's testimony. Moreover, the respondent's testimony, the aunt's testimony, and the Form I-589 are all consistent regarding the fatal retribution that the respondent would suffer if she were returned to Morocco. *See Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *Matter of B-*, 21 I&N Dec. 66 (BIA 1995).

Unlike the Immigration Judge, we place a great deal of weight on the testimony of the respondent's aunt and disagree that such testimony constituted mere embellishment of the respondent's claim. We find that the aunt's testimony was introduced to bolster the respondent's account and that the inclusion of such testimony was legitimate. We not only encourage, but require the introduction of corroborative testimonial and documentary evidence, where available. *See Murphy v. INS*, 54 F.3d 605, 611 (9th Cir. 1995) (holding that "[t]estimony should not be disregarded merely because it is . . . in the individual's own interest")*; Matter of M-D-*, 21 I&N Dec. 1180 (BIA 1998); *Matter of Y-B-*, 21 I&N Dec. 1136 (BIA 1998); *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989); *see also Matter of Acosta*, 19 I&N Dec. 211, 218 (BIA 1985) (disagreeing with the Immigration Judge's "conclusion that the respondent's testimony should be rejected solely because it is self-serving"), *modified on other grounds*, *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

In addition, we find significant the aunt's testimony regarding the severity and frequency of the beatings suffered by the respondent and the futility of seeking governmental protection in such instances in light of

societal religious mores. *See* Coven, U.S. Dep't of Justice, *Considerations for Asylum Officers Adjudicating Asylum Claims From Women* (1995) ("Breaching social mores (e.g., marrying outside of an arranged marriage, wearing lipstick or failing to comply with other cultural or religious norms) may result in harm, abuse or harsh treatment that is distinguishable from the treatment given the general population, frequently without meaningful recourse to state protection."). Furthermore, we do not find the aunt's lack of awareness of the respondent's suicide attempts while in Morocco damaging to the respondent's own testimony regarding such attempts, particularly in light of subsequent evidence that documents the respondent's persistent suicidal tendencies.

We find particularly significant the evidence of record regarding the respondent's fear of seeking governmental protection from her father's abuse. Both the respondent and her aunt testified that, in Moroccan society, such action would be not only unproductive but potentially dangerous. The report of the United States Department of State that is contained in the record confirms that "few women report abuse to authorities" because the judicial procedure is skewed against them, as even medical documentation is considered insufficient evidence of physical abuse, and women who do not prevail in court are returned to the abusive home. Committees on International Relations and Foreign Relations, 105th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1997* 1538 (Joint Comm. Print 1998) [hereinafter 1997 *Country Reports*].

Finally, we find that, in addition to corroborating the respondent's testimony concerning the futility and perils of seeking governmental protection, the 1997 *Country Reports* corroborate other dimensions of the testimony offered by the respondent and her aunt. The report states that, in Morocco, domestic violence is commonplace and legal remedies are generally unavailable to women. *Id.* at 1538. The report also indicates that "[g]irls are much less likely to be sent to school than are boys" and notes that the illiteracy rate for women is 67 percent. *Id.* at 1539.

We conclude that the respondent presented credible testimony in support of her asylum claim. We must therefore decide whether the respondent merits the relief that she has requested. Although we have held that a respondent does not meet her burden of proof when she fails to establish a credible record, the obverse is not true. *See Matter of O-D-*, 21 I&N Dec. 1079 (BIA 1998). In other words, "a finding of credible testimony is not necessarily dispositive." *Matter of E-P-*, 21 I&N Dec. 860, 862 (BIA 1997).

### III. ASYLUM AND WITHHOLDING OF REMOVAL

We have reviewed the Immigration Judge's decision, the testimonial and documentary evidence of record, and the legal submissions of the par-

ties. Based on the record before us and our analysis of the relevant law, we find the respondent statutorily eligible for asylum.

### A. Generally

When adjudicating an alien's eligibility for relief, we are mindful of "the fundamental humanitarian concerns of asylum law." *Matter of S-P-*, 21 I&N Dec. 486, 492 (BIA 1996); *see also Matter of Chen*, 20 I&N Dec. 16 (BIA 1989); Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva 1979). Even when abuse is severe and long-standing, an applicant for asylum "bears the burden of establishing that he or she meets the 'refugee' definition of section 101(a)(42)(A) of the Act." *Matter of S-P-*, *supra*, at 489; *see also* 8 C.F.R. § 208.13(a) (2000). To satisfy this burden, the alien must demonstrate past persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* section 208(a) of the Act; *see also* section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994).

### B. Evidence

Although it is well established that an applicant's asylum burden of proof can be met through testimony alone, corroborative documentary evidence is usually also required. *See Matter of Mogharrabi*, *supra*. We have held that, in most instances, "the introduction of supporting evidence is [not] purely an option with an asylum applicant." *Matter of Dass*, *supra*, at 124; *see also Matter of M-D-*, *supra*; *Matter of Y-B-*, *supra*; *cf. Duarte de Guinac v. INS*, 179 F.3d 1156 (9th Cir. 1999) (holding that country condition reports are not meant to corroborate specific acts of persecution but merely to provide information about the context in which alleged persecution occurred); *Canjura-Flores v. INS*, 784 F.2d 885 (9th Cir. 1985).

We find that the respondent, largely through her own consistent and credible testimony, has met her evidentiary burden in this case. *See Matter of Mogharrabi*, *supra*. However, we also note the importance of the corroborative evidence provided by testimony of the respondent's aunt and the 1997 *Country Report*s contained in the record. *See Duarte de Guinac v. INS*, *supra; Matter of M-D-*, *supra*; *Matter of Y-B-*, *supra*.

### C. Past Persecution

We have recognized that past persecution can be a basis for granting asylum, even absent a showing of a well-founded fear of future persecution.

*See Matter of H-*, 21 I&N Dec. 337, 339 (BIA 1996); *see also Matter of D-V-*, 21 I&N Dec. 77 (BIA 1995) (recognizing as persecution grievous harm suffered in Haiti in direct retaliation for activities on behalf of Jean-Bertrand Aristide); *Matter of B-*, *supra* (recognizing that the arrest, interrogation, and severe physical abuse of a Mujahidin supporter in Afghanistan constituted persecution); *Matter of Chen*, *supra* (recognizing that the severe repression of the applicant during China's "Cultural Revolution" constituted persecution). Pursuant to federal regulations, an applicant who has established past persecution is presumed to have also demonstrated a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i); *see also Matter of Chen*, *supra*, at 18 (stating that "a rebuttable presumption arises that an alien who has been persecuted in the past by his country's government has reason to fear similar persecution in the future"). The Immigration and Naturalization Service can rebut this presumption by showing that country conditions have changed to such an extent that the basis for the finding of past persecution no longer exists. *See* 8 C.F.R. § 208.13(b)(1)(i).

In the instant case, the source of the respondent's repeated physical assaults, imposed isolation, and deprivation of education was not the government, but her own father. Although she did not request protection from the government, the evidence convinces us that even if the respondent had turned to the government for help, Moroccan authorities would have been unable or unwilling to control her father's conduct. The respondent would have been compelled to return to her domestic situation and her circumstances may well have worsened. *See, e.g.*, *Matter of Chen*, *supra*; *Matter of D-V-*, *supra*. In view of these facts, we conclude that the respondent established that she suffered past persecution in Morocco at the hands of her father and could not rely on the authorities to protect her. The Service has made no showing that conditions in Morocco have materially changed such that, upon her return, the respondent could reasonably expect governmental protection from her persecutor.

## D. Well-Founded Fear

An alien may also establish eligibility for asylum by demonstrating that a reasonable person in his or her circumstances would fear persecution in the future on account of a protected ground. *See* sections 101(a)(42)(A), 208(a) of the Act; *Matter of Kasinga*, *supra*, at 365 (*citing Matter of Mogharrabi*, *supra*); *see also INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); 8 C.F.R. § 208.13(b)(2). We find that the evidence of record convincingly establishes that, upon her return, the respondent would likely face severe, possibly fatal, persecution. *See Matter of H-*, *supra*; *Matter of Chen*, *supra*.

### E. "On Account of"

An alien must also demonstrate that the persecution alleged was inflicted or would be inflicted on account of race, religion, nationality, membership in a particular social group, or political opinion. Sections 101(a)(42)(A), 208(a) of the Act. An asylum applicant is not obliged, however, to show conclusively why persecution has occurred or may occur. *See, e.g.*, *Matter of S-P-*, *supra*.

The jurisprudence relevant to the respondent's allegations includes decisions granting relief to those persecuted on the basis of their religious beliefs. Both this Board and the federal circuit courts of appeals have found merit to the claims of aliens asserting that they were persecuted on account of their religion. *See, e.g., Kossov v. INS*, 132 F.3d 405, 409 (7th Cir. 1998) (finding past persecution where a woman applicant was beaten and taunted because of her religious beliefs and eventually suffered a miscarriage); *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996) (holding that dress and conduct rules pertaining to women may amount to persecution if a woman's refusal to comply is on account of her religious or political views); *Matter of Chen*, *supra*, at 19-20 (granting relief to the son of a Christian minister who was subjected to atrocious persecution, including burns to his body, house arrest, and a prohibition on school attendance).

We find that the persecution suffered by the respondent was on account of her religious beliefs, as they differed from those of her father concerning the proper role of women in Moroccan society. The record clearly establishes that, because of his orthodox Muslim beliefs regarding women and his daughter's refusal to share or submit to his religion-inspired restrictions and demands, the respondent's father treated her differently from her brothers. *See Fisher v. INS*, *supra*, at 961 (stating that Board decisions "define 'persecution' generally as 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive'" (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995)); *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir. 1985) (finding that an alien was a refugee where she had endured "oppression . . . inflicted . . . because of a difference that the persecutor [would] not tolerate").

Because the persecution suffered by the respondent was on account of her religious beliefs, we find this case distinguishable on the facts from circuit court decisions holding that persecution on account of gender alone does not constitute persecution on account of membership in a particular social group. *See, e.g.*, *Gomez v. INS*, 947 F.2d 660 (2d Cir. 1991). We also find that because of the religious element in this case, the domestic abuse suffered by the respondent is different from that described in *Matter of R-A-*, Interim Decision 3403 (BIA 1999).

## F. Discretion

A question of fraud has been raised by this record regarding the documents that the respondent presented when seeking to enter the United States. In view of our favorable credibility finding and the respondent's background, we accept her explanation that she understood the documents to be valid and that she did not intend to present fraudulent documents. As there are no other adverse factors of record, we find that the respondent merits a favorable exercise of discretion.

## IV. CONCLUSION

We conclude that the respondent is statutorily eligible for asylum. We further find that a favorable exercise of discretion is warranted in this case. Accordingly, the respondent's appeal will be sustained and her asylum application will be granted. Because we have determined that the respondent's asylum application should be approved, we find it unnecessary to address her application for withholding of removal under section 241(b)(3) of the Act.

**ORDER:** The respondent's appeal from the denial of her asylum application is sustained. The respondent is granted asylum and is admitted to the United States as an asylee.