**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHANGIZ RAHIMZADEH,

        *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney General,

        *Respondent.*

No. 08-73985

Agency No.
98-764-810

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 9, 2010—Seattle, Washington

Filed July 26, 2010

Before: A. Wallace Tashima, Raymond C. Fisher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

10673

## COUNSEL

Randy J. Tanner and Matthew B. Hayhurst, Boone Karlberg P.C., Missoula, Montana, pro bono counsel for the petitioner.

Tony West, Terri J. Scadron, and Corey L. Farrell, Civil Division, U.S. Department of Justice, Washington, DC, for the respondent.

## OPINION

BERZON, Circuit Judge:

Changiz Rahimzadeh (Rahimzadeh) testified that he was persecuted first in Iran by the government on account of his political activity and later in the Netherlands by Muslim extremists on account of his conversion to Christianity. The Immigration Judge (IJ) deemed Rahimzadeh's testimony credible and granted withholding of removal to Iran, but denied asylum from, and withholding of removal to, the Netherlands. The IJ concluded that Rahimzadeh had not suffered past persecution in the Netherlands and that his fear of future persecution was not objectively reasonable, because he did not show that Dutch authorities were unable or unwilling to control his attackers. After the Board of Immigration Appeals (BIA) affirmed without opinion, Rahimzadeh petitioned this court for review. We deny the petition, for reasons that will duly appear.

## I.  BACKGROUND

### A.  Rahimzadeh's Testimony

Rahimzadeh entered the United States on a B-1 visa on September 6, 2006. He applied for withholding of removal to Iran, and asylum from, and withholding of removal to, the

Netherlands on November 6, 2007.[1] In his removal hearing, Rahimzadeh testified to the abuse he suffered in Iran because of his political leanings and in the Netherlands because of his religious beliefs. The IJ deemed Rahimzadeh's testimony credible, and the BIA did not find otherwise, so "we accept as undisputed the testimony of the applicant." *Baballah v. Ashcroft*, 367 F.3d 1067, 1073 (9th Cir. 2004) (citation omitted).

Rahimzadeh was born on April 19, 1964 to a Muslim family in Tehran, Iran, where he lived until he turned sixteen. At that time, his family moved to the nearby city of Karaj because of difficulties arising from their pro-monarchy political leanings. Rahimzadeh helped the Mujahedin movement oppose the Islamic Republic, although he never became a Mujahedin member. Police arrested him for involvement with the Mujahedin and sent him to Evin prison, where guards interrogated and tortured him for three to four days using techniques such as beating his feet with cables and contorting his body into positions so he could not breathe. Rahimzadeh was convicted of aiding terrorists and held in prison for approximately three years.

After he was released, police arrested Rahimzadeh twice more for attempting to escape Iran without permission. On the first occasion, they sent him to Evin prison, where he attempted suicide; on the second, they held him for nineteen days. At some point, a doctor in Iran prescribed medication to Rahimzadeh to treat PTSD.

Rahimzadeh later traveled to Turkey and Japan. While in Japan, he converted to Christianity and was baptized. After two years, in 1992, Japanese officials ordered him deported to Iran, but he went to the Netherlands instead and applied for asylum, which was granted in 1996.

---

[1]Although there were issues raised regarding the timeliness of the asylum application, the IJ found the application timely.

While in the Netherlands, Rahimzadeh practiced Christianity, proselytized to Muslims, including a visit to a Dutch mosque, and in 1994 gave a televised interview during which he discussed the torture and abuse he suffered in Iran. In 1999, unidentified people whom Rahimzadeh believed to be Muslims from Morocco came to his home in Amersfoort, put a knife to his throat, blindfolded him, laid him on the floor, read the Koran, and beat his feet with cables, all while complaining of his conversion to Christianity. The invaders threatened to kill him if he reported the incident to the police. After the incident, fearing for his safety, Rahimzadeh went to Canada for three months and to the United States for five, on tourist visas. He then returned to the Netherlands to be with his brother, with whom he feels close. (Both his sister and brother live in the Netherlands and remain Muslims.)

Rahimzadeh again experienced difficulties in the Netherlands in 2005, when he began to receive anonymous threatening calls to his cell phone. He believed the callers to be fanatical Muslims based in the Netherlands. They threatened to kill him because of his religious conversion and warned that they would hurt or kill his sister if he reported the calls to police. Rather than report the calls, Rahimzadeh traveled again to the United States on a tourist visa for two to three months. On his return to the Netherlands the phone calls started again. Rahimzadeh did not buy a new cell phone because of the cost and his belief that extremist Muslim groups would find his new number.

Ultimately, while Rahimzadeh was still living in Amersfoort, four people carrying guns forced him into a car for ten to fifteen minutes. They threatened to kill him and harm his family if he continued to attend his church and to kill his sister if he reported the incident to police.

Rahimzadeh did not report this incident — or any other of the threats and attacks — to Dutch police. Instead, one month after the last incident, he left again for the United States.

Before his departure, he stayed briefly in Amsterdam, where he felt unsafe because he perceived the Netherlands to be a small country with a large Muslim population and approximately "280,000 fanatic[s]" from whom the authorities were unable to protect him. Rahimzadeh fears for his life if he returns to the Netherlands.

## B. Other Evidence

Rahimzadeh presented expert testimony that he suffers from PTSD arising from the torture in Iran and the kidnapping in the Netherlands. He also presented documentary evidence detailing Islamic radicalism in the Netherlands and death threats to Muslims who convert to Christianity.

The government offered documentary evidence as well, including the 2006 U.S. Department of State Country Reports for the Netherlands, indicating that the Dutch government "at all levels . . . did not tolerate [abuse of the right to freedom of religion], either by governmental or private actors," that the Netherlands had taken "firm action against groups espousing violence in support of an Islamic extremist agenda," that the law and the judiciary provide effective relief for abuses of human rights, that police forces are "generally effective," and that the government takes steps to deal with any shortcomings in its human rights record.

## C. IJ and BIA Decisions

The IJ credited Rahimzadeh's testimony; granted withholding of removal to Iran under section 241(b)(3) of the Immigration and Nationality Act (INA); did not reach his application for withholding of removal to Iran under CAT; and denied asylum from, and withholding of removal to, the Netherlands. Although the IJ found that Rahimzadeh suffered abuse rising to the level of persecution in the Netherlands on account of his religion, the IJ determined that the Muslims who abused Rahimzadeh were neither government agents nor

individuals whom the government was unable or unwilling to control. Noting that Rahimzadeh failed to report the incidents to authorities, the IJ observed that recourse to the authorities likely would not have been futile, because country reports indicate that the Dutch government seeks to promote and protect religious liberty and that the law and judiciary provide effective means of addressing individual instances of private violence.

The BIA affirmed without opinion. Rahimzadeh timely petitioned for review.

## II. DISCUSSION

Where, as here, the BIA affirms without opinion, the IJ's decision is the final agency determination for purposes of this court's review. *Renteria-Morales v. Mukasey*, 551 F.3d 1076, 1081 (9th Cir. 2008). We review the IJ's legal determinations de novo, subject to established principles of deference. *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1055 (9th Cir. 2006). We must uphold the IJ's factual findings "if supported by reasonable, substantial, and probative evidence on the record." *Id.* at 1056 (internal quotations omitted). Thus, "[e]ven if we might have reached a conclusion different from that reached by the [IJ], we may not reverse unless we determine that any reasonable factfinder would have been compelled to reach that conclusion." *Lolong v. Gonzales*, 484 F.3d 1173, 1178 (9th Cir. 2007).

[1] The Attorney General has discretion to grant asylum to any alien who qualifies as a "refugee" within the meaning of section 101(a)(42)(A) of the INA. *See* 8 U.S.C. § 1158(b)(1). The applicant has the burden to establish his status as a refugee, *id.* § 1158(b)(1)(B)(i), defined as a person "unable or unwilling" to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A); *Navas v. INS*, 217

F.3d 646, 654 (9th Cir. 2000). Central to this case is the requirement that, to demonstrate persecution within the meaning of the Act, the applicant show that abuse was "committed by the government or forces the government is either unable or unwilling to control." *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2004); *Navas*, 217 F.3d at 655-56.

**[2]** Dutch officials did not participate in or sponsor the attacks on Rahimzadeh, so Rahimzadeh must establish that the Dutch government was unable or unwilling to control his attackers. He has not done so. Rahimzadeh never reported the abuse to police; instead, his evidence of the government's inability or unwillingness to stop the attacks consists solely of a private threat of harm and the presence of what he estimates to be 280,000 extremist Muslims in the Netherlands. In concluding that Rahimzadeh failed to carry his burden to establish the Dutch government's inability or unwillingness to control his attackers, the IJ relied on the fact that Rahimzadeh had never reported the abuse and on Department of State country reports. Rahimzadeh claims that (1) the IJ erroneously imposed a reporting requirement for asylum, and (2) the IJ erroneously relied on country reports in finding that the Dutch authorities would have been able to control his attackers. Given the record and the IJ's reasoning, we cannot agree.

Where the persecutor is not a state actor, "we consider whether an applicant reported the incidents to police, because in such cases a report of this nature may show governmental inability to control the actors." *Baballah*, 367 F.3d at 1078; *see also Andriasian v. INS*, 180 F.3d 1033, 1037, 1042-43 (9th Cir. 1999); *Singh v. INS*, 94 F.3d 1353, 1360 (9th Cir. 1996). The reporting of private persecution to the authorities is not, however, an essential requirement for establishing government unwillingness or inability to control attackers. *See Ornelas-Chavez*, 458 F.3d at 1057. A government's inability or unwillingness to control violence by private parties can be established in other ways — for example, by demonstrating that a country's laws or customs effectively deprive the peti-

tioner of any meaningful recourse to governmental protection. *See, e.g.*, *In re S-A-*, 22 I. & N. Dec. 1328, 1330, 1332-33, 1335 (B.I.A. 2000).

In *In re S-A-*, a Moroccan woman suffered emotional and physical abuse by her father because her liberal Muslim beliefs clashed with his orthodox Muslim beliefs. 22 I. & N. Dec. at 1329. He burned her thighs, beat her in the face with a ring, and beat her at least once a week with his hands, feet, and belt. *Id.* She never went to the police because her mother's previous attempts to get police protection had failed and because under Muslim law, as enforced in Morocco, a father has "unfettered" power over his daughter, including the ability to limit access to education and require her to stay at home. *Id.* at 1330-31. In addition to being unproductive or futile "in light of societal religious mores," turning to the police for protection also was "potentially dangerous." *Id.* at 1332-33. The Country Report "corroborate[d] . . . testimony concerning the futility and perils of seeking governmental protection," noting that few women report abuse because "domestic violence is commonplace and legal remedies are generally unavailable to women" who, upon losing in court, "are returned to the abusive home." *Id.* at 1333. The BIA held that "[a]lthough she did not request protection from the government, the evidence convinces us that even if the respondent had turned to the government for help, Moroccan authorities would have been unable or unwilling to control her father's conduct." *Id.* at 1335; *cf. Castro-Perez v. Gonzales,* 409 F.3d 1069, 1070-72 (9th Cir. 2005) (denying asylum to a Honduran national who not only failed to report being raped twice by her boyfriend but also failed to show otherwise the inability or unwillingness of the Honduran government to control rape, which is classified in Honduras as a crime and punishable by imprisonment).

Prior interactions with the authorities also can establish a government's inability or unwillingness to provide protection. *See Ornelas-Chavez*, 458 F.3d at 1054. *In Ornelas-Chavez*, a

transgender Mexican national faced repeated abuse by private and state actors. *Id.* His parents beat him, cousins and acquaintances raped him, the police killed two of his homosexual acquaintances, and, on one occasion, the police arrested and detained him for several hours with the police chief threatening to detain him longer in the future if he again heard about him having sex with men. *Id.* His coworkers at a state-run prison repeatedly beat and threatened him. *Id.* He never reported abuse to police because "indifference and danger . . . characterized his dealings with government officials," and the police had inflicted the same type of abuse on him. *Id.* at 1057. The court held that he "need not have reported . . . persecution [at the hands of private parties] to the authorities if he can convincingly establish that doing so would have been futile or [would] have subjected him to further abuse." *Id.* at 1058.

**[3]** None of these cases, or any other we have found, creates a freestanding reporting requirement to qualify for asylum. The absence of a report to police does not reveal anything about a government's ability or willingness to control private attackers; instead, it leaves a gap in proof about how the government would respond if asked, which the petitioner may attempt to fill by other methods. These methods, in addition to those already surveyed, might include showing that others have made reports of similar incidents to no avail, *see Afriyie v. Holder*, No. 08-72626, slip op. at p. 10662-63 (9th Cir. July 26, 2010), or establishing that private persecution of a particular sort is widespread and well-known but not controlled by the government, *see Avetova-Elisseva v. INS*, 213 F.3d 1192, 1198 (9th Cir. 2000).

Rahimzadeh argues that the IJ did impose an absolute reporting requirement and so erred. We disagree.

To establish that the IJ applied the wrong standard, Rahimzadeh cites the IJ's statement of "disagree[ment] with [Rahimzadeh's] argument that he did not have to show that he

reported incidents in which he was harmed to government authorities in order to establish past persecution in the Ninth Circuit," and also to the IJ's subsequent determination of ineligibility for asylum from the Netherlands "due to [Rahimzadeh's] failure to report incidents of harm to the police and evidence that the Dutch authorities are responsive to reports of religious extremism."

**[4]** The objection is misplaced. While the IJ could have crafted those sentences more artfully, in context it is clear that the IJ treated the failure to report the persecution as merely one factor in the assessment of the Dutch government's willingness and ability to control private extremists, not as a per se bar to asylum. The IJ found that the reasons Rahimzadeh gave for not reporting the abuse, namely the private threat of retaliation and his perception of the Netherlands as being home to thousands of fanatical Muslims, did not independently satisfy his burden to establish that the Dutch authorities would have been unable or unwilling to control his attackers, particularly in light of Rahimzadeh's failure to provide other information about the record of the Dutch authorities in controlling private extremists. On the record as a whole, the IJ found, "circumstances strongly suggest that if [Rahimzadeh] had sought help from the Dutch authorities, they would have been willing and able to assist him" because the government made "active efforts to address and control violence by radical religious groups." Ultimately, the IJ concluded that Rahimzadeh did not qualify for asylum "because he failed to show that the harm he suffered occurred at the hands of his government or an agent that his government was unwilling or unable to control."

**[5]** The IJ's conclusion that the Dutch authorities in fact would have been willing and able to control Rahimzadeh's attackers was supported by substantial evidence. The U.S. Department of State's 2006 Country Report on Human Rights practices in the Netherlands notes that "[Dutch] law provides for freedom of religion, and the government generally respec-

t[s] this right in practice." As noted above, "the law and judiciary provide[ ] effective means of addressing individual instances of [human rights] abuse" including "violence against some religious and ethnic minorities," and that "the government [has taken] firm action against groups espousing violence in support of an Islamic extremist agenda." The 2006 U.S. Department of State International Religious Freedom Report also indicates that "[t]he Government at all levels sought to protect [the freedom of religion] in full and did not tolerate its abuse, either by governmental or private actors."

**[6]** Rahimzadeh contends that it was error to rely on the State Department country profile of the Netherlands. Not so. Even when an applicant is deemed credible, the IJ can rely on other evidence in the record, including country reports, to supplement the testimony. *See*, *e.g.*, *Castro-Perez*, 409 F.3d at 1072. Although general country-level information is ordinarily insufficient to contradict direct, specific, credited testimony, *see Afriyie*, slip op. at p. 10664-65; *see also Chand v. INS*, 222 F.3d 1066, 1078-79 (9th Cir. 2000), the IJ did not use the country reports for that purpose. Instead, the IJ accepted Rahimzadeh's testimony regarding threats, incidents of abuse, and all the other factual circumstances as to which Rahimzadeh had direct knowledge. The IJ turned to the country reports only to assess the likelihood that government officials would control the persecution, as Rahimzadeh failed to provide any useful evidence on that point through his testimony. The IJ did not use the country reports to counteract specific credible evidence of incidents inconsistent with the country reports. *Cf. Afriyie*, slip op. at p. 10664-65.

Finally, that Rahimzadeh received private threats of retaliation does not compel the conclusion that the Dutch government is unable or unwilling to control private persecution. In most cases of abuse by private actors, there will be at least an implicit threat of retaliation for recourse to the authorities. While private threats may explain an applicant's reluctance to go to the authorities, the question in an asylum case is

whether the police could and would provide protection. *See Lolong*, 484 F.3d at 1178.

**[7]** In sum, substantial evidence in the record supported the IJ's conclusion that Rahimzadeh failed to carry his burden to show the inability or unwillingness of police to provide that protection. We thus cannot conclude that the record compels the finding that Rahimzadeh is entitled to asylum.

## III.   CONCLUSION

Given that the burden was on Rahimzadeh to show that the Dutch authorities were unable or unwilling to control his attackers, we cannot say that the IJ erred in concluding that he did not meet it. Because Rahimzadeh did not demonstrate that he is eligible for asylum, his claim for withholding of removal, governed by a more stringent standard, is also foreclosed. *Gomes v. Gonzales*, 429 F.3d 1264, 1266 (9th Cir. 2005).

Petition DENIED.