W. FLETCHER, Circuit Judge,
dissenting:
Carlos Bringas-Rodriguez, a Mexican national, testified credibly that throughout his childhood in the town of Tres Valles in the state of Veracruz he was sexually abused by his uncle, his cousins, and a neighbor. His abusers told him they were abusing him because he was gay, and they referred to him using homophobic slurs. His abusers also punched him and beat him, and they threatened to hurt him and his grandmother if he told anyone about the abuse.
Bringas-Rodriguez left Mexico twice. The first time, he came to the United States at age twelve and lived briefly with his mother and step-father in Kansas. *1186 While he was in Kansas, some of his gay Mexican friends told him that they had reported similar abuse to Mexican police officers but that the officers had laughed at them, refused to provide help, and told them they deserved the abuse they received. The second time, he came to the United States at age fourteen. He has not returned to Mexico.
Bringas-Rodriguez never reported to Mexican police the abuse he suffered. He testified credibly before the Immigration Judge (“IJ”) that he did not do so because he believed a report would be pointless.
The panel majority denies Bringas-Rod-riguez’s asylum claim. The majority relies primarily on Castro-Martinez v. Holder, 674 F.3d 1073 (9th Cir.2011), a decision in which we denied a similar asylum claim. But Castro-Martinez was a carefully circumscribed decision. In Castro-Martinez we stated that, even if a petitioner himself had not reported abuse, asylum could be warranted if the petitioner showed that Mexican officials were unwilling to help other gay victims of abuse.
I have growing doubts about the correctness of Castro-Martinez, an opinion with which I agreed when it was issued. However, even to the extent Castro-Martinez should remain the law of this circuit, I respectfully dissent from the panel’s conclusion that it forecloses relief in this case.
I. Past Persecution in Mexico
Carlos Bringas-Rodriguez began to realize his same-sex attractions when he was six. As early as ten years old, he considered himself gay. As a child, Bringas-Rodriguez was physically abused by his father, who told him, “Act like a boy, you’re not a woman.” His father abused Bringas-Rodriguez’s mother and siblings as well, but he abused Bringas-Rodriguez the most because he was “different.”
Bringas-Rodriguez was also abused and raped by an uncle, his cousins, and a neighbor. Bringas-Rodriguez’s uncle began to sexually abuse him when he was just four years old, and his uncle abused him every two or three months thereafter. After Bringas-Rodriguez turned seven, his cousins sexually abused him on a monthly basis. Bringas-Rodriguez’s uncle, cousins, and a neighbor raped him at home when his mother was not there, and sometimes dragged him into nearby bushes in the neighborhood. Bringas-Rodriguez’s abusers told him that they would hurt him and his grandmother if he told anyone, and, on a few occasions, they punched him. On one occasion, when Bringas-Rodriguez resisted one cousin’s attempt to rape him, the cousin beat him severely.
When Bringas-Rodriguez was eight, his uncle told him that the reason for the ongoing abuse was Bringas-Rodriguez’s sexuality. His uncle was not alone in his anti-gay views. Bringas-Rodriguez testified, “[my abusers] never called me by my name but called me fag, fucking faggot, queer and laughed about it.”
Bringas-Rodriguez first came to the United States in 2002, when he was twelve. He lived in Kansas with his mother and step-father for five months, and continued to hide his sexuality and history of sexual abuse. When Bringas-Rodriguez returned to Mexico to live with his grandmother after his stay in Kansas, the abuse resumed unabated. Bringas-Rodriguez’s uncle sexually abused him again. Brin-gas-Rodriguez’s cousins referred to him as their “sex toy” and resumed their abuse. A neighbor raped him. The neighbor’s assault left Bringas-Rodriguez with bruises all over his body. Because of the continuing abuse and rape, Bringas-Rodri-guez fled Mexico, returning to the United States in 2004 at age fourteen.
Bringas-Rodriguez never told the Mexican police about the abuse he had suffered. Even though he wanted protection from *1187 his abusers, Bringas-Rodriguez believed any complaints to the police would have been futile. He testified before the IJ that, while he was living in Kansas, two Mexican gay friends “told me that they got raped, they got beat up, like abuse, and they went to the police and they didn’t do anything. They even laugh [in] their faces.” In a declaration submitted to the Immigration Court, Bringas-Rodriguez wrote that he feared that the Mexican police “would laugh at me and tell me I deserved what I got because I was gay. This happened to friends of mine in Veracruz.”
II. Persecution the Government is Unable or Unwilling to Control
To establish his eligibility for asylum, Bringas-Rodriguez “must demonstrate that he is unable or unwilling to return to his home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or a political opinion.” Castro-Martinez, 674 F.3d at 1080 (citing 8 U.S.C. § 1101(a)(42)(A)). Bringas-Rodriguez must also show the harm was “inflicted either by the government or by individuals or groups the government is unable or unwilling to control.” Id.
A. Persecution on the Basis of a Protected Ground
We have held that gay men in Mexico “can constitute a social group for the purpose of an asylum claim.” Id.; see also Boer-Sedano v. Gonzales, 418 F.3d 1082, 1087-89 (9th Cir.2005). Undisputed evidence in the record shows that Bringas-Rodriguez was abused, over a sustained period, for being gay. Bringas-Rodriguez testified that his uncle told him he was being abused because he was gay. Brin-gas-Rodriguez also testified that his uncle, cousins, and neighbor “never called me by my name but called me fag, fucking faggot, queer and laughed about it.” Every person who abused Bringas-Rodriguez throughout his childhood either told him that he was being abused for being gay or referred to him using homophobic slurs.
B. Government Unable or Unwilling to Control the Harm
The question at the heart of this case is thus not whether Bringas-Rodriguez was abused because he was gay. Rather, it is whether Bringas-Rodriguez can show that the Mexican government was unable or unwilling to control his abusers. I agree with the panel majority that this question is currently controlled by Castro-Martinez, an opinion I joined four years ago. But I part ways with the majority as to the meaning and application of Castro-Martinez.
In Castro-Martinez, we discussed different methods by which an asylum seeker could demonstrate a government’s inability or unwillingness to control harm inflicted by private parties. For example, we stated that “the BIA may consider whether the victim reported the attacks to the police.” Castro-Martinez, 674 F.3d at 1080. While such a report can suffice to demonstrate a government’s unwillingness to control the persecution, a report is not necessary. “We have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now.” Id. at 1081. But if the victim does not report to the police, there is a “gap in proof about how the government would have responded.” Id. (alterations omitted) (quoting Rahimzadeh v. Holder, 613 F.3d 916, 922 (9th Cir.2010)). In such cases, the petitioner bears the burden of filling that gap. Id.
We were careful in Castro-Martinez to list “other avenues” through which a petitioner could carry this burden. Id. Specif *1188 ically, we identified four additional ways in which an asylum seeker like Bringas-Rod-riguez could show that his government was unwilling or unable to prevent persecution by non-governmental parties. He could:
1.. “establish[ ] that private persecution of a particular sort is widespread and well-known but not controlled by the government”;
2. “show[] that others have made reports of similar incidents to no avail”;
3. “demonstrate] that a country’s laws or customs effectively deprive the petitioner of any meaningful recourse to governmental protection”; or
4. “convincingly establish that going to the authorities would have been futile or would have subjected the individual to further abuse.”
Id. at 1081 (alterations omitted) (quoting Rahimzadeh, 613 F.3d at 921-22). After reviewing the facts in Castro-Martinez, we concluded that the petitioner did not present sufficient evidence to show that Mexican officials would have been unable or unwilling to prevent his abuse. Id.
The panel majority here concludes that Castro-Martinez compels denial of Brin-gas-Rodriguez’s petition because “[t]he facts in Bringas’s case are very similar to those in Castro-Martinez.” 'Op. at 1178. The facts are similar in one respect. In both cases, petitioners introduced United States State Department country reports describing police violence against homosexuals. In Castro-Martinez, the petitioner “submitted country reports documenting societal discrimination against homosexuals in Mexico and attacks on gay men committed by private parties.” 674 F.3d at 1079. “He also presented evidence of widespread police corruption in Mexico and incidents of police violence against homosexuals.” Id. We concluded that these reports, without more, did not “compel the conclusion that the police would have disregarded or harmed a male child who reported being the victim of homosexual rape by another male.” Id. at 1081.
In the case now before us, Bringas-Rodriguez submitted similar country reports. Because Bringas-Rodriguez left Mexico in 2004 and has not returned since, the relevant period for purposes of our analysis is the years before 2004. Brin-gas-Rodriguez submitted country reports from 2009 and 2010. Although the 2009 and 2010 reports post-date the period at issue in this case, they provide" probative information. Both country reports state that in Mexico discrimination and persecution based on sexual orientation — including discrimination and persecution by governmental officials — had lessened over time. But they also state that discrimination and persecution remained serious problems, five and six years after Bringas-Rodriguez left the country.
The 2009 country report states, “While homosexual conduct experienced growing social acceptance, the National Center to Prevent and Control HIV/AIDS stated that discrimination persisted.” The 2010 country report similarly notes that, according to a governmental agency and a nonprofit organization, “societal discrimination based on sexual orientation” remained “common.” The 2009 report continues:
One of the most prominent cases of discrimination and violence against gay men was that of Agustín Humberto Estrada Negrete, a teacher and gay activist from Ecatepec, Mexico State. In 2007 he participated in a gay rights march wearing a dress and high heels. According to the NGO Asilegal, soon after the march, Estrada began receiving threatening telephone calls and verbal and physical attacks. In 2008 he was fired from the school for children *1189 •with disabilities where he worked. After his dismissal, he and a group of supporters began lobbying the government to reinstate him; when they went to the governor’s palace to attend a meeting with state officials in May, police beat him and his supporters. The next day he was taken to prison, threatened, and raped. Although he was released, Estrada continued to face harassment by state authorities.
(Emphasis added.) Through these reports, Bringas-Rodriguez established that government discrimination on the basis of sexuality in Mexico persisted, even years after he fled the country.
While Castro-Martinez and Bringas-Rodriguez both produced relevant country reports detailing the Mexican government’s continued discrimination against homosexuals, the facts of their cases are dissimilar' in a critical respect. Unlike Castro-Martinez, Bringas-Rodriguez provided evidence that “others have made reports of similar incidents to no avail.” Castro-Martinez, 674 F.3d at 1081. Specifically, Bringas-Rodriguez presented evidence that while living in Kansas, gay Mexican friends told him they had reported similar sexual abuse and that the Mexican police in Veracruz had refused to take action. Bringas-Rodriguez’s oral testimony was brief, but quite clear:
Q: You can go tell police if you return to Mexico and suffer abuse, you could tell the police.... Couldn’t you do that?
A: They will do nothing.
Q: How do you know that?
A: I know that because when I was living in Kansas, couple of my friends told me that they got raped, they got beat up, like abuse, and they went to the police and they didn’t do anything. They even laugh [in] their faces.
Bringas-Rodriguez provided similar testimony in his written declaration, explaining that, if he reported his abuse, the police “would laugh at me and tell me I deserved what I got because I was gay. This happened to friends of mine in Veracruz.”
Neither the BIA nor the IJ mentioned Bringas-Rodriguez’s testimony about what his friends had told him. In fact, the IJ, whose decision the BIA affirmed, stated in denying asylum that “we certainly do not have any evidence whatsoever” that Mexican authorities were unwilling to protect a child like Bringas-Rodriguez. The IJ’s statement is wrong. It is undisputed that Bringas-Rodriguez submitted probative country reports, and that he provided both oral and written testimony that his friends had reported similar sexual abuse to police in Veracruz, and the police refused to take action.
Despite this evidence, the panel majority rejects Bringas-Rodriguez’s asylum claim. To rebut Bringas-Rodriguez’s country reports, the majority asserts that governmental discrimination on the basis of sexual orientation in Mexico has lessened in recent years. Op. at 1179. Although the relevant time period for purposes of Bringas-Rodriguez’s claim is before 2004, the majority cites evidence from the past few years, even citing a report published only this year. Op. at 1179-80 n. 5. This evidence has limited utility. We recognized in a recently published opinion that while Mexico has made some advances in its treatment of homosexuals, there has actually been “an increase in violence against gay, lesbian, and transgender individuals during the years in which greater legal protections have been extended to these communities” and that “there is a continued failure to prosecute the perpetrators of homophobic hate crimes throughout Mexico.” Avendano-Hernandez v. Lynch, 800 F.3d 1072, 1081-82 (9th Cir.2015) (emphasis in original).
The panel majority then concludes that Bringas-Rodriguez’s additional evidence— *1190 the statements of his friends — is also not sufficient. The majority’s primary complaint is that the evidence lacks specificity. Op. at 1180. To support this conclusion, the majority lists a number of details that, in its view, are crucially absent from Brin-gas-Rodriguez’s testimony. These details include the names of his two friends, their ages, “the nature of their relationship to Bringas,” “how or to whom they reported their abuse,” or “any evidence showing that these nameless friends actually reported any abuse to the Mexican authorities.” Op. at 1180. But Bringas-Rodri-guez did provide a number of these details. Bringas-Rodriguez explained the nature of the relationship: they were his Mexican friends who had recounted to him in Kansas their experience in Veracruz. While he did not state their exact ages, a reasonable inference, given that they were his friends, is that they were his age contemporaries. He also testified as to whom the friends had reported their abuse: Mexican police in Veracruz. Finally, he provided evidence that the friends had made the reports: his credible testimony about what they had told him.
The panel majority also partially discounts the statements of Bringas-Rodriguez’s friends because they are hearsay. Op. at 1178-79, 1180-81. .However, it is well established in our case law that hearsay — even hearsay upon hearsay — is proper evidence in asylum proceedings. Ramirez-Alejandre v. Ashcroft, 319 F.3d 365, 370 (9th Cir.2003) (en banc). Hearsay is sometimes (though only sometimes) less probative and reliable than direct evidence. But because of the particular difficulties asylum seekers have in obtaining direct evidence, we are more willing to credit hearsay in asylum cases than in conventional litigation. See, e.g., Cordoru-Garcia v. I.N.S., 204 F.3d 985, 992-93 (9th Cir.2000) (holding “Petitioner’s testimonial evidence,” which consisted of “hearsay, and, at times, hearsay upon hearsay,” sufficient to support the presumption that petitioner had a well-founded fear of future persecution).
The majority also suggests that Brin-gas-Rodriguez’s testimony is suspect because much, perhaps all, of the abuse Brin-gas-Rodriguez suffered had already taken place by the time he talked to his friends in Kansas. See Op. at 1178-79 n. 4. But this is irrelevant. The question at issue is not what Bringas-Rodriguez knew about the police when he was a child. Rather, the question is whether the Mexican police would have helped Bringas-Rodriguez if he had reported his abuse to them. An asylum seeker can present probative evidence that he or she obtained only after escaping-from persecution. See, e.g., Cordon-Garcia, 204 F.3d at 992-93 (relying upon petitioner’s evidence, obtained only after the petitioner departed her home country, to find that petitioner established a well-founded fear of future persecution); Gjerazi v. Gonzales, 435 F.3d 800, 809 (7th Cir.2006) (holding the IJ erred in excluding documentary evidence of persecution solely because the evidence was only acquired after the petitioner arrived in the United States).
Finally, the majority makes geographic objections to Bringas-Rodriguez’s evidence. For example, it discounts Bringas-Rodriguez’s country reports because neither report “mentions any instances of discrimination or persecution in his home state of Veracruz.” Op. at 1179. This objection ignores the fact that Bringas-Rodriguez’s additional evidence — the statements of his friends about their experiences in Veracruz — corroborates the country reports and demonstrates that discrimination against homosexuals extends to Bringas-Rodriguez’s home state. Similarly, the majority objects that Bringas-Rodriguez’s evidence does not discuss “the specific police practices in Bringas’s town *1191 of Tres Valles.” Op. at 1180. But Tres Valles is in the state of Veracruz. Our Court has “adjusted the evidentiary requirements” for asylum seekers in light of “the serious difficulty with which asylum applicants are faced in their attempts to prove persecution.” Matty v. Ashcroft, 381 F.3d 942, 947 (9th Cir.2004) (quoting Cordon-Garcia, 204 F.3d at 993). Accordingly, we do not require a petitioner to provide evidence of the specific practices of his hometown when he presents evidence of statewide or even countrywide persecution. See, e.g., Yan Rang Zhao v. Holder, 728 F.3d 1144, 1147-48 (9th Cir.2013) (finding the BIA erred in requiring a Chinese petitioner to provide evidence of the government policy in her town and noting that “[njeither the BIA nor this court has previously required municipal-level proof when the petitioner presents province-level proof’).
In sum, we wrote in Castro-Martinez that a gay petitioner qualifies for asylum when he provides country reports documenting official persecution on account of sexual orientation, supplemented by evidence that “others have made reports of similar incidents to no avail.” 674 F.3d at 1081. We denied relief in Castro-Martinez because the petitioner had not, in the view of the panel, provided such supplemental evidence. In this case, Bringas-Rodriguez has provided the additional evidence that was lacking in Castro-Martinez. He testified that his Mexican friends (“others”) had told police in his home state of Veracruz that they were abused because of their sexuality (“had made reports of similar incidents”) and that the police did nothing (“to no avail”).
III. Revisiting Castro-Martinez
As noted above, I have growing doubts about our decision in Castro-Martinez. As the panel majority writes, the facts of Castro-Martinez resemble this case. In both cases, a gay, HIV-positive man sought asylum based on a long history of childhood abuse suffered in Mexico because of his sexuality. Id. at 1078-79. Both victims failed to report their abuse to Mexican officials. Id. at 1080. And both victims provided country reports describing anti-gay sentiments and persecution by Mexican authorities. The BIA denied asylum in both cases, on the ground that the victims failed to show that the Mexican government was unable or unwilling to control the abusers. Id. at 1081.
We denied Castro-Martinez’s petition for review. We concluded that there was “no evidence in the record that Mexican authorities would have ignored the rape of a young child or that authorities were unable to provide a child protection against rape.” Id. We wrote that Castro-Martinez offered nothing more than his belief that “the police would not have helped him.” Id. “[S]uch a statement, without more, is not sufficient to fill the gaps in the record regarding how the Mexican government would have responded had Castro reported his attacks.” Id.
If the only evidence Castro-Martinez offered had been his unsupported belief, I would continue to think our decision in that case was correct. Asylum seekers must show that “the government concerned was either unwilling or unable to control the persecuting individual or group.” Matter of Pierre, 15 I. & N. Dec. 461, 462 (BIA 1975). Unsubstantiated assertions that the government is unwilling or unable to control a persecutor do not suffice to carry that burden.
Castro-Martinez, however, did offer evidence to show Mexican officials would not have helped him. As we wrote in our opinion, “Castro also stated that he was afraid of contacting the police because they would likely abuse him on account of his homosexuality. Castro presented country reports documenting police corruption and *1192 participation in torture, abuse, and trafficking, as well as incidents of police harassment of gay men.” Castro-Martinez, 674 F.3d at 1081. Despite this, we held that Castro-Martinez still had not carried his burden because “none of these reports compel the conclusion that the police would have disregarded or harmed a male child who reported being the victim of homosexual rape by another male.” Id.
I have come to believe that Castro-Martinez demands an unwarranted level of specificity from country reports. In rejecting Castro-Martinez’s claim, we held that statements in country reports that Mexican police harassed homosexuals and ignored their claims of abuse was not enough. We required, instead, a statement in the report focusing specifically on gay children — a statement that Mexican police ignored reports by gay male children who were abused by other males. The panel majority here does the same. It discounts Bringas-Rodriguez’s evidence of governmental discrimination against homosexuals generally, and instead affirms the IJ’s conclusion that Bringas-Rodriguez failed to provide evidence showing that the Mexican government would not have responded to “the abuse of children.” Op. at 1179-80, 1181-82 (emphasis in original).
Given the nature of crimes of sexual violence against children and the difficulty children face in reporting them, Castro-Martinez and the panel majority require evidence that few victims can supply. Many children will not report these crimes for some of the same reasons Bringas-Rodriguez did not. Abusers often threaten their victims with harm if they tell anyone, and they sometimes make good on those threats. Children also have difficulty getting information to the police, especially if family members or neighbors — the people who might report the abuse — are the abusers. By discounting country reports that describe discrimination against homosexuals generally and instead requiring reports specifically addressing gay children, Castro-Martinez effectively requires abused children to report to the police, either to provide relevant evidence for the country reports or to establish the requisites for asylum in their own cases.
Conclusion
We have repeatedly held that victims, especially child victims, of private persecution need not report their abuse to obtain asylum. Castro-Martinez, 674 F.3d at 1081 (‘We have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now.”); Rahimzadeh, 613 F.3d at 921 (“The reporting of private persecution to the authorities is not ... an essential requirement for establishing government unwillingness or inability to control attackers.”); Ornelas-Chavez v. Gonzales, 458 F.3d 1052, 1057 (9th Cir.2006). Yet, Castro-Martinez and today’s decision effectively require just that. In Castro-Martinez, by demanding unrealistic specificity from country reports, we effectively eliminated those reports as a method of showing a foreign government’s inability or unwillingness to prevent sexual abuse of gay children. In today’s opinion, we effectively eliminate another avenue for obtaining relief. In Castro-Martinez, we wrote that evidence that “others have made reports of similar incidents to no avail” could be used to show a government’s inability or unwillingness to prevent private harm. Brin-gas-Rodriguez presented precisely such evidence, and he presented it in the only form — hearsay—likely to be available to someone in his position.
Bringas-Rodriguez, like most abused children, did not report to the police the sexual abuse he suffered. Thus, when seeking aslyum, Bringas-Rodriguez had to rely on other evidence of the Mexican gov *1193 ernment’s inability or unwillingness to protect him. He provided 2009 and 2010 country reports describing police indifference to, and participation in, discrimination and violence against homosexuals. He also testified that his gay friends told him that when they reported to the Mexican police in his home state of Veracruz similar abuse they had suffered, the police laughed in their faces and told them that they deserved the abuse they were receiving. That should be enough.
I respectfully dissent.