**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CARLOS ALBERTO BRINGAS-RODRIGUEZ, AKA Patricio Iron-Rodriguez, *Petitioner*, | No. 13-72682 |
| | Agency No. A200-821-303 |
| v. | |
| LORETTA E. LYNCH, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 18, 2014—Pasadena, California

Filed November 19, 2015

Before: William A. Fletcher and Jay S. Bybee, Circuit
Judges and Benjamin H. Settle,[*] District Judge.

Opinion by Judge Bybee;
Dissent by Judge W. Fletcher

---

[*] The Honorable Benjamin H. Settle, District Judge for the U.S. District Court for the Western District of Washington, sitting by designation.

## SUMMARY[**]

### Immigration

The panel denied a petition for review of the Board of Immigration Appeals' denial of asylum, withholding of removal, and protection under the Convention Against Torture to a citizen of Mexico who sought relief based on his sexual orientation and HIV-positive status.

Relying on *Castro-Martinez v. Holder*, 674 F.3d 1073 (9th Cir. 2011), the panel held that substantial evidence supported the Board's determination that Bringas-Rodriguez failed to establish that the Mexican government was unwilling or unable to protect him, where he did not report the abuse he suffered to authorities, and his evidence, including hearsay testimony and country reports, was insufficient to establish that doing so would have been futile.

The panel held that Bringas-Rodriguez failed to establish a pattern or practice of persecution of gay men in Mexico. The panel also held that Bringas-Rodriguez's CAT claim failed because he did not show that he would more likely than not be tortured by or with the acquiescence of the Mexican government if he is removed to Mexico.

The panel held that the Board did not abuse its discretion in denying Bringas-Rodriguez's motion to remand based on his recent HIV diagnosis.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge W. Fletcher wrote that he has growing doubts about this court's decision in *Castro-Martinez*, but even applying *Castro-Martinez* to the facts of this case, Bringas-Rodriguez submitted evidence sufficient to show that the Mexican government was unwilling or unable to protect him from abuse.

**COUNSEL**

Andrea Ringer (argued) and Marco Pulido Marques (argued), Certified Law Students, University of California, Irvine School of Law, Appellate Litigation Clinic, Irvine, California; Mary-Christine Sungaila, Pro Bono Attorney, Snell & Wilmer LLP, Costa Mesa, California, for Petitioner.

Stuart F. Delery, Assistant Attorney General, Civil Division, Kohsei Ugumori and John W. Blakeley (argued), Senior Litigation Counsel, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent.

Peter E. Perkowski, Winston & Strawn LLP, Los Angeles, California, for Amici Curiae The Public Law Center, Lambda Legal Defense and Education Fund, the National Immigrant Justice Center, the Center for HIV Law and Policy; HIV Law Project; Immigration Equality; Disability Rights Legal Center; and the Asian & Pacific Islander Wellness Center.

**OPINION**

BYBEE, Circuit Judge:

Petitioner Carlos Bringas-Rodriguez is a citizen of Mexico and a gay man who was sexually abused by family members and a neighbor in Mexico. He challenges the BIA's decision denying his applications for asylum, withholding of removal, and Convention Against Torture (CAT) protection, and denying his motion to remand to the IJ in light of his recent HIV diagnosis. Relying on our decision in *Castro-Martinez v. Holder*, 674 F.3d 1073 (9th Cir. 2011), the BIA found that Bringas failed to show that the Mexican government was unwilling or unable to control those who perpetrated such acts. We have jurisdiction under 8 U.S.C. § 1252(a), and we deny the petition.

I

Petitioner, Bringas-Rodriguez (Bringas), was born and raised in Tres Valles, Veracruz, Mexico. He began to realize that he was attracted to men at age six, and by age ten he considered himself gay. He is now openly gay and is HIV-positive. As a child, he suffered physical abuse at the hands of his father, who would tell him to "Act like a boy, you're not a woman!" and to "Do things a man does." His father also abused Bringas's mother and siblings, but he says he was abused "most of all . . . because [he] was different."

Bringas was later sexually abused by his uncle, cousins, and a neighbor. His uncle began the abuse when Bringas was four and continued the abuse every two or three months until he turned twelve. When Bringas turned seven, his cousins began to abuse him on a monthly basis as well. Bringas

testified that when he turned eight, his uncle admitted to him that he was sexually abusing him because Bringas was gay. He further recalled that his abusers "never called [him] by [his] name but called [him] fag, f_____g faggot, queer and laughed about it."

Bringas first came to the United States with his mother and stepfather in 2002 when he was twelve, and he lived with them in Kansas for five months. Bringas was undocumented. He then moved back to Mexico because he was "troubled" over hiding his sexuality and history of abuse, and he wanted to live with his grandmother. Once back in Mexico, however, the abuse continued. His uncle, cousins, and a neighbor raped him in his early teens. He never reported the abuse to the police, believing such a complaint would be frivolous, and he did not tell his family until years later, fearing that his abusers would harm his mother or grandmother.

In 2004, at age fourteen, Bringas returned to the United States to live with his mother and stepfather in Kansas and "to escape [his] abusers." In August 2010, Bringas was convicted of "Contributing to the Delinquency of a Minor" in Colorado; essentially, he was drinking at his house and a friend brought over a minor. Bringas spent ninety days in jail, where he attempted suicide. DHS filed a Notice to Appear in September 2010.

In February 2012, Bringas filed an application for asylum, withholding of removal, and relief under the CAT, alleging that he was raped by his uncle, cousins, and neighbor while living in Mexico. He explained that he feared returning to Mexico because he would be persecuted for being gay and the police would ignore his complaints. The IJ denied all applications for relief. He denied Bringas's asylum claim

because it was untimely.[1]  With respect to withholding, the IJ found that Bringas had suffered sexual abuse at the hands of his uncle, cousins, and neighbor, but concluded that the abuse, while "horrendous," did not constitute past persecution "on account of" a protected status.  The IJ found that "perverse sexual urges" motivated the abusers, and not Bringas's sexual orientation.  The IJ also observed that Bringas never reported his abuse to an adult or to the Mexican police and that there was no evidence that Mexican authorities were unwilling to offer protection.

Turning to the risk of future persecution, the IJ looked at Country Reports for Mexico for 2009 and 2010 and found that, despite a few specific accounts of persecution of homosexuals in Mexico, the country as a whole—and especially in Mexico City—has made significant advances with respect to gay people.  Accordingly, Bringas could relocate to a place like Mexico City without risking possible future abuse.  So, the IJ found, Bringas did not show a "more likely than not possibility of persecution on account . . . of his membership in a particular social group of male homosexuals."

---

[1] Bringas entered the United States in November 2004 but did not file an asylum application until April 2011, well beyond the one-year deadline. The IJ acknowledged that being an unaccompanied minor entering the country may qualify as an "exceptional circumstance" that excuses late filing, but even assuming that Bringas was an unaccompanied minor upon entering the United States, his application was still untimely because he waited years after turning eighteen to file it.  Bringas had argued, however, that in this case the age of adulthood was twenty-one, not eighteen, which would make his asylum application timely because it was filed before his twenty-first birthday.  But the IJ rejected this reasoning, finding no evidence to suggest that asylum officers use twenty-one and not eighteen to determine the legal disability excuse.

The IJ also denied relief under the CAT on the grounds that Bringas offered insufficient evidence that the government routinely turns a blind eye to allegations of sexual abuse of children. As a result, Bringas could not prove that "torture in the future by the government, or with the acquiescence of the government" was likely.

The BIA affirmed. It denied Bringas's asylum claim on the merits, assuming the application was timely filed. The BIA concluded that Bringas failed to establish past persecution because (1) he could not show that he was abused on account of a protected ground, and (2) he had not demonstrated that the government was unwilling or unable to control his abusers. Bringas was thus not entitled to a presumption of future persecution. The BIA also found that Bringas did not have a well-founded fear of future persecution because he failed to show a "pattern or practice" of persecution against gays in Mexico. Citing our opinion in *Castro-Martinez v. Holder*, 674 F.3d 1073, 1082 (9th Cir. 2011), the BIA explained that no "widespread brutality against homosexuals or . . . criminalization of homosexual conduct [exists] in Mexico." Additionally, the BIA discussed Mexico's improved treatment of homosexuals over the years: "Mexico has taken numerous positive steps to address the rights of homosexuals, including legalizing gay marriage in Mexico City and prosecuting human rights violations against homosexuals."

The BIA also rejected Bringas's withholding of removal and CAT claims. With respect to withholding, it noted that because Bringas "failed to satisfy the lower burden of proof required for asylum, it follows that he has also failed to satisfy the higher standard of eligibility required for withholding of removal." With respect to CAT, the BIA

found no clear error in the IJ's determination that Bringas failed to show that he will more likely than not be tortured in Mexico "by or with the acquiescence" of the Mexican government.

Finally, the BIA rejected Bringas's argument that his case be remanded to the IJ in light of Bringas's recent HIV diagnosis. Bringas's brief to the BIA explained that, since his hearing before the IJ, he had been diagnosed with HIV. He argued that "this fact is significant because it now places [him] in a more vulnerable position should he be returned to Mexico." The BIA declined to remand Bringas's case to the IJ for further consideration because Bringas had "not provided any additional country conditions evidence or specific arguments regarding how his status as an HIV positive homosexual changes the outcome of his case." He filed a timely Petition for Review of the BIA's dismissal and sought a stay pending review. We granted the stay and now deny the petition for review.[2]

## II

Bringas argues that the BIA erred in denying his asylum and withholding of removal claims. "To be eligible for asylum, an alien must demonstrate that he is unable or unwilling to return to his home country because of [past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a

---

[2] "We review questions of law in immigration proceedings *de novo*." *Romero-Mendoza v. Holder*, 665 F.3d 1105, 1107 (9th Cir. 2011). We review the denials of asylum, withholding of removal, and CAT relief for substantial evidence. *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014).

particular social group, or a political opinion." *Castro-Martinez v. Holder*, 674 F.3d 1073, 1080 (9th Cir. 2011) (citing 8 U.S.C. § 1101(a)(42)(A)). The requirements for a withholding claim are similar, except that the alien must prove a "clear probability" of persecution on account of a protected characteristic. 8 U.S.C. § 1231(b)(3)(A). If a petitioner cannot establish his eligibility for asylum, his withholding claim necessarily also fails. *Zehatye v. Gonzales*, 453 F.3d 1182, 1190 (9th Cir. 2006).

Substantial evidence supports the BIA's determinations that Bringas failed to establish past persecution or a well-founded fear of future persecution, and he is thus ineligible for asylum. *See Castro-Martinez*, 674 F.3d at 1080 (9th Cir. 2011); *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)) (noting that we must uphold the BIA's factual findings if "supported by reasonable, substantial, and probative evidence on the record considered as a whole").[3] Because Bringas failed to meet his burden to establish eligibility for asylum, he also fails the higher burden required to obtain withholding of removal. *Castro-Martinez*, 674 F.3d at 1082 (citing *Gomes v. Gonzales*, 429 F.3d 1264, 1266 (9th Cir. 2005)).

---

[3] We cannot resolve Bringas's asylum claim on untimeliness grounds because the BIA ignored this procedural defect when it "assume[d] arguendo that the respondent filed a timely asylum application." *See Abebe v. Gonzales*, 432 F.3d 1037, 1041 (9th Cir. 2005) (en banc) ("When the BIA has ignored a procedural defect and elected to consider an issue on its substantive merits, we cannot then decline to consider the issue based upon this procedural defect.").

*A.  Past Persecution*

Asylum petitioners may produce evidence of their past persecution, which "creates a presumption of a fear of future persecution." *Hanna v. Keisler*, 506 F.3d 933, 937 (9th Cir. 2007); *see* 8 C.F.R. § 1208.13(b)(1).   To establish past persecution, Bringas must show (1) that he has suffered harm "on the basis of [a] protected ground[]" and (2) that the harm was "inflicted either by the government or by individuals or groups the government is unable or unwilling to control." *Castro-Martinez*, 674 F.3d at 1080.  The BIA concluded that Bringas failed to satisfy both prongs.  We will only address the second of these prongs.  Even if we thought that the record compelled the conclusion that Bringas was abused on account of his sexual orientation, Bringas provided insufficient evidence that the government was unwilling or unable to prevent that abuse.

Because the sexual abuse Bringas suffered was not inflicted by government actors, he must "show that the government was unable or unwilling to control his attackers." *Id.* at 1078.  "In determining whether the government was unable or unwilling to control violence committed by private parties, the BIA may consider whether the victim reported the attacks to the police."   *Id.* at 1080 (citing *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 (9th Cir. 2004)); *see id.* ("[W]here the persecutor is not a state actor, we consider whether an applicant reported the incident to police, because in such cases a report of this nature may show governmental inability to control the actors.") (quoting *Rahimzadeh v. Holder*, 613 F.3d 916, 921 (9th Cir. 2010) (internal quotation marks omitted)).  Nevertheless, petitioners are not required to report persecution to the police in order to show that the government is unable or unwilling to control their abusers.

*Id.* at 1080–81 ("We have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now.").

Where a petitioner does not report the abuse to the authorities, however, there is a "gap in proof about how the government would have responded," and the petitioner bears the burden to "fill in the gaps" by showing how the government would have responded had he reported the abuse. *Id.* at 1081 (internal quotation marks and alterations omitted). It is insufficient for a petitioner to state his belief that the government would do nothing about a report of abuse. Rather, a petitioner may show, "[a]mong other avenues," that "private persecution of a particular sort is widespread and well-known but not controlled by the government or . . . that others have made reports of similar incidents to no avail." *Id.* (quoting *Rahimzadeh*, 613 F.3d at 922) (internal quotation marks omitted).

We agree with the BIA that Bringas has not met his burden to prove the government's unwillingness to respond. The BIA relied on our decision in *Castro-Martinez v. Holder*, 674 F.3d 1073, 1080–81 (9th Cir. 2011), in determining that Bringas had not met his burden here. The facts in Bringas's case are very similar to those in *Castro-Martinez*. In *Castro-Martinez*, Castro, a gay, HIV-positive Mexican man, sought asylum on account of a credible history of sexual abuse suffered because of his sexual orientation. *Id.* at 1078–79. Castro also had failed to report the abuse to Mexican officials, and the BIA ultimately concluded that he had failed to demonstrate that "Mexican authorities would have ignored the rape of a young child or that authorities were unable to provide a child protection against rape." *Id.* at 1081; *see also id.* at 1079. We denied Castro's petition for review.

Bringas attempts to distinguish *Castro-Martinez*.   He argues that while Castro offered nothing more than a conclusory statement "that he believed the police would not have helped him," *id.* at 1081, Bringas "provided such gap-filling evidence" by giving a reason why he never reported his abuse to the Mexican police: He testified that "a couple" of his gay friends told him "that they got raped, they got beat up, like abuse, and they went to the police [in Veracruz, Mexico]  and they didn't do anything" except "laugh [in] their faces."[4]

We agree with the dissent that *Castro-Martinez* left open the possibility that Bringas could meet his burden of proving that the government was unable or unwilling to control their abusers by "showing that others have made reports of similar incidents to no avail."  *Id.* (citation and internal quotation marks omitted).  But we part ways with the dissent's assertion that *Castro-Martinez* "qualifies" a "gay petitioner . . . for asylum" as a matter of course, provided that he submits "country reports documenting official persecution on account of sexual orientation" and "evidence"—unsubstantiated hearsay or otherwise—that "others have made reports of similar incidents to no avail."  Dissenting Op. at 38 (quoting *Castro-Martinez*, 674 F.3d at 1081).  *Castro-Martinez* sets forth no such mechanical formula for obtaining asylum, nor

---

[4] Bringas did not provide a clear picture of when he spoke with these friends.  We know it was at some point "when [he] was living in Kansas," but he lived in Kansas twice.  His uncle and cousins abused him from age four to twelve.  Then, he moved to Kansas with his mother and stepfather at age twelve, but five months later, he moved back to Mexico, where the abuse continued.  At age fourteen, Bringas moved back to Kansas again. Thus, Bringas would have heard his friends' accounts of their abuse in Veracruz after at least some (if not all) of Bringas's own abuse had already occurred.

does our holding there support the proposition that any evidence of other reports of similar incidents, no matter how unreliable, is sufficient to satisfy this "other avenue" of establishing that a government is unable or unwilling to prevent persecution. Implicit in *Castro-Martinez*'s holding is that, in order for this method of proof to be successful, the evidence must be sufficient.

Here, we agree with the IJ and the BIA that Bringas's evidence was not sufficient. Looking first to the country reports Bringas submitted, neither the 2009 nor the 2010 report mentions any instances of discrimination or persecution in his home state of Veracruz, Mexico. Indeed, the two reports, produced by the U.S. State Department to survey the state of sexual orientation discrimination across a country of 122 million people, note *only one* specific example of government persecution on the basis of sexual orientation in Mexico. The dissent highlights this incident in detail, but does not explain why the IJ reviewing this documentation should have concluded that a single example "establish[es] that government discrimination . . . persist[s]." Dissenting Op. at 34. Nor does the dissent seek to draw any connections from this incident, which occurred in 2008, to circumstances in Tres Valles, a town nearly 300 miles away.

Rather, the country reports Bringas provided to the IJ highlighted "gay pride marches in cities across the country," the largest drawing 400,000 participants. Additionally, the report described the expansion of marriage equality in Mexico City, and detailed a ruling from the Mexican Supreme Court requiring Mexico's states to recognize legally performed marriages performed elsewhere, a ruling, we note, that was made five years before the United States Supreme Court reached a similar conclusion. In sum, the country

reports submitted to the IJ simply do not make a persuasive case that the Mexican government was unwilling or unable to protect Bringas.[5]

---

[5] Seemingly aware that Bringas's evidence demonstrating government discrimination or persecution on the basis of sexual orientation was somewhat thin, the dissent instead highlights the ongoing "societal discrimination" referenced in the country reports. Dissenting Op. at 33 (quoting the 2010 country report). While certainly troubling, negative social attitudes in one's home country cannot form the basis for an asylum claim. *See Ghaly v. I.N.S.*, 58 F.3d 1425, 1431 (9th Cir. 1995) ("Discrimination . . . as morally reprehensible as it may be, does not ordinarily amount to 'persecution.'"). If that was the case, LGBT Americans in many parts of this country, unfortunately, would have a valid claim to seek asylum in other parts of the world, including Mexico.

Indeed, the United Nations recognizes Mexico's "history of protecting asylum-seekers" and notes that it has "long been a signatory of the 1951 Refugee Convention and its 1967 Protocol." *UNHCR Hails Mexico as New Refugee Law Comes Into Force*, U.N. HIGH COMM'N FOR REFUGEES (Jan. 28, 2011), http://www.unhcr.org/4d42e6ad6.html. In 2011, President Felipe Calderón signed new legislation to ensure that Mexico's asylum system conformed to international standards. *Id.* Three years later, Mexico adopted the "Brazil Declaration and Plan of Action," an international agreement committed to "the protection of refugees," including "particularly vulnerable groups" like "lesbian, gay, bisexual, transgender, and intersex people." *See Brazil Declaration and Plan of Action*, Dec. 3, 2014, at 8, http://www.acnur.org/t3/fileadmin/scripts/ doc.php?file=t3/fileadmin/Documentos/BDL/2014/9865. And this year, a United Nations report noted that Mexico had established a "specialized hate crime prosecution unit[]," developed a "new judicial protocol to guide adjudication of cases involving human rights violations on grounds of sexual orientation," implemented specialized training for police officers, and officially designated May 17 as "National Day Against Homophobia." *See* U.N. High Commissioner for Human Rights, *Discrimination & Violence Against Individuals Based on Their Sexual Orientation & Gender Identity*, ¶¶ 40, 74, U.N. Doc. A/HRC/29/23 (May 4, 2015), http://www.un.org/en/ga/search/view_doc.asp?symbol=A/ HRC/29/23&referer=/english/&?Lang=E.

Turning next to Bringas's testimony, Bringas provided very few details about his friends' negative experiences with police in Veracruz.  He offered no details about his friends' accounts—no names, ages, indication of the nature of their relationship to Bringas, information on how or to whom they reported their abuse, or any evidence showing that these nameless friends actually reported any abuse to the Mexican authorities.  Even if we could fully credit Bringas's friends' statements, there is no evidence connecting general police practices in the state or city of Veracruz with the specific police practices in Bringas's town of Tres Valles.**[6]**  Without something to suggest that the police in Tres Valles would respond in the same way as the police described in Bringas's friends' reports, we decline his invitation to compel the BIA to paint all the police in Veracruz with the same broad brush.

The dissent resists this conclusion by stating that because Bringas's friends reported discrimination by police in Veracruz and "Tres Valles is in the state of Veracruz," any "geographic objection[s]" to Bringas's evidence must fail.  Dissenting Op. at 37–38.  To draw a parallel, the dissent's argument is that if someone reports discrimination at the hands of police in "California," it would be fair to assume that police in San Diego, Eureka, or Santa Barbara would act in accordance with that report.  We refuse to make this

---

**[6]** We note that the Mexican state of Veracruz supports a population of nearly eight million residents divided into more than two hundred distinct municipalities.  *See Perspectiva Estadística Veracruz de Ignacio de la Llave*, INSTITUTO NACIONAL DE ESTADÍSTICA Y GEOGRAFÍA, Dec. 2011, at 9–10, 14, http://www.inegi.org.mx/est/contenidos/espanol/sistemas/ perspectivas/perspectiva-ver.pdf.  The city of Veracruz is roughly eighty miles away from Bringas's town of Tres Valles.  *See* MAPQUEST, http://www.mapquest.com/maps?1c=Veracruz&1y=MX&2c=Tres%20 Valles&2y=MX (last visited Nov. 3, 2015).

unfounded logical leap. The dissent is correct that in light of the difficulty of gathering evidence of persecution, we "adjust[] the evidentiary requirements" for asylum seekers, *id.* at 14 (quotation marks omitted); we do not, however, forego them completely, and reference to vague reports from anonymous friends cannot overcome the lack of any corroborating evidence.[7]

By highlighting the factual gaps in Bringas's description of his friends' reports, the dissent suggests that we inappropriately discount his testimony despite the fact that the IJ found his testimony "credible." *See* Dissenting Op. at 36. Not so. We agree that as "a general rule, because the Immigration Judge did not render an adverse credibility finding, we must accept [Bringas's] factual testimony as true" and that Bringas's "testimony includes hearsay evidence from . . . anonymous friend[s]" that "may not be rejected out-of-hand." *Gu v. Gonzales*, 454 F.3d 1014, 1021 (9th Cir. 2006). Similarly, we do not challenge the "well established" principle, Dissenting Op. at 36, that "hearsay [evidence] is admissible in immigration proceedings," *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 823 (9th Cir. 2003).

---

[7] The dissent's citation to *Yan Rong Zhao v. Holder*, 728 F.3d 1144 (9th Cir. 2013), to support its position is inapposite. There, we observed that "evidence from the local province, municipality, *or* other locally defined area may be sufficient to show a well-founded fear of persecution; respondents are not required to present evidence from their town or city." *Id.* at 1147–48 (emphasis in original). But at issue in *Zhao* were family planning policies memorialized in a written notice from the "Family Planning Office." *Id.* at 1146. Had Bringas produced roughly comparable evidence of Mexico's, Veracruz's, or Tres Valles's policy or practice, we would not be having this exchange.

However, these two propositions do not compel the result pressed for by the dissent. As we have repeatedly held "the absence of an adverse credibility finding does not prevent us from considering the relative probative value of hearsay." *Gu*, 454 F.3d at 1021; *see also Singh v. Holder*, 753 F.3d 826, 835 (9th Cir. 2014); *Sharma v. Holder*, 633 F.3d 865, 870–71 (9th Cir. 2011). Indeed, in *Gu*, we explained that "statements by the out-of-court declarant may be accorded less weight by the trier of fact when weighed against non-hearsay evidence." 454 F.3d at 1021. Here, without many details to flesh out the context of Bringas's friends' hearsay statements, their relative probative value is rather low.

To be clear, we are not, as the dissent charges, "discount[ing]" Bringas's hearsay testimony. Dissenting Op. at 36. Nor are we requiring a certain level of "specificity" in Bringas's description of his friends' out-of-court reports. *Id.* at 11. Instead, we are making what, we think, are common-sense observations: A more detailed description should be afforded greater weight than a less detailed description, and hearsay statements with details that can be corroborated are more probative than hearsay statements that do not include any verifiable details.

The dissent's response to these conclusions brings the very problem this hearsay evidence poses into sharp relief. In light of Bringas's hearsay testimony and submitted country reports, the dissent chastises the IJ's statement that "'we certainly do not have any evidence whatsoever' that Mexican authorities were unwilling to protect" Bringas as plainly "wrong." Dissenting Op. at 35. The dissent only quoted the IJ in part. Here is the full statement:

> [W]e certainly do not have any evidence whatsoever that the police in Mexico or the authorities do not take any action whatsoever to offer some type of protection against *the abuse of   children,* sexually, whether the sexually abused child is a male or female, or whether the abuser is a male or a female.

(emphasis added).

The IJ's finding is quite correct. There is no doubt that Bringas did not offer any evidence suggesting that Mexican police refused to protect abused children. The submitted country reports make no reference to it, and because Bringas's hearsay statement was so lacking in detail, we have no idea how old his "friends" were who reported abuse to the police in Veracruz. Because Bringas's testimony was so vague, even the dissent's attempts to bolster its veracity get tangled up in its factual shortcomings. Rather, the full statement of the IJ only demonstrates how firmly in line the IJ and BIA were with this court's precedent. *See Castro-Martinez*, 674 F.3d at 1081 (affirming the BIA's reliance on the lack of "evidence in the record that Mexican authorities would have ignored the rape of a young child or that authorities were unable to provide a child protection against rape").[8]

---

[8] The dissent also argues that "[n]either the BIA nor the IJ mentioned Bringas-Rodriguez's testimony about what his friends had told him." Dissenting Op. at 35. True enough. But that does not mean the IJ and the BIA did not consider or weigh that evidence. This court has repeatedly found that an IJ's decision is not required "to discuss every piece of evidence" presented by a petitioner. *Almaghzar v. Gonzales*, 457 F.3d 915, 922 (9th Cir. 2006); *see also Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011) ("That is not to say that the BIA must discuss each piece of

As the IJ recognized, Bringas's allegations are not just about discrimination against gay and lesbian Mexicans—they are about child molestation.  Bringas has put forward no evidence that Mexico tolerates the sexual abuse of children, or that Mexican officials would refuse to protect an abused child based on the gender of his or her abusers.  Instead, substantial evidence supports the BIA's finding that Bringas failed to prove that the government would be unwilling or unable to control his abusers, and Bringas's bare hearsay assertions from friends of unknown ages are insufficient to overturn the BIA's contrary conclusion, which was based on other evidence in the record.  Accordingly, we hold that Bringas failed to establish his past persecution and is therefore not entitled to a presumption of a well-founded fear of future persecution.  *See* 8 C.F.R. § 1208.13(b)(1).

## B.  *Well-Founded Fear of Future Persecution*

Alternatively, in the absence of evidence of past persecution, a petitioner may simply provide evidence of a well-founded fear of future persecution.  "To establish a well-founded fear," Bringas must show "that his fear of persecution is subjectively genuine and objectively reasonable."  *Castro-Martinez*, 674 F.3d at 1082 (citing *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007)).  "As there was no adverse credibility determination, we accept that [Bringas's] fear of future persecution was genuine."  *Id.* (citing *Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009)).  In order to show that his fear of future persecution was "objectively reasonable," Bringas has two avenues.  He may demonstrate:  (1) "that he was a member of a disfavored

---

evidence submitted.").  Here, Bringas's evidence is not sufficient to compel a contrary result.

group against which there was a systematic pattern or practice of persecution," or (2) that he belongs to a "disfavored group" and has an individualized risk of being "singled out for persecution." *Id.*; *Sael v. Ashcroft*, 386 F.3d 922, 925 (9th Cir. 2004); *see* 8 C.F.R. § 1208.13(b)(2)(iii).

Bringas's "pattern or practice of persecution" argument lacks merit, and he forfeited his argument that he will be "singled out" as a member of a "disfavored group" when he failed to raise it before the BIA.

### 1. Pattern or Practice of Persecution

Bringas argues that there is a pattern or practice of persecution of gay men in Mexico. Despite some evidence of violence against gays in Mexico, *Castro-Martinez* forecloses this argument. In *Castro-Martinez*, we rejected the claim that "the Mexican government systematically harmed gay men and failed to protect them from violence." 674 F.3d at 1082. Although we acknowledged evidence of discrimination and attacks, we explained that country conditions reports showed that "the Mexican government's efforts to prevent violence and discrimination against homosexuals. . . . ha[d] increased in recent years," and, we noted, "Mexican law prohibits several types of discrimination, including bias based on sexuality, and it requires federal agencies to promote tolerance." *Id.* (recognizing the Mexican government's 2005 "radio campaign to fight homophobia" and noting the various country reports' reflections of the "ongoing improvement of police treatment of gay men and efforts to prosecute homophobic crimes").

Here, the BIA made findings similar to those in *Castro-Martinez* and found that the situation for gay men in Mexico

is improving. It first cited *Bromfield v. Mukasey*, 543 F.3d 1071, 1078 (9th Cir. 2008), a case where we held that there was a pattern or practice of persecution against gay men in Jamaica—a country which criminalized homosexual conduct and prosecuted individuals under the law; the evidence there also showed numerous cases of violence and widespread brutality against persons based on sexual orientation. Then the BIA turned to Bringas's case and stated that unlike *Bromfield*:

> [T]he record here does not demonstrate widespread brutality against homosexuals or that there is any criminalization of homosexual conduct in Mexico. . . . To the contrary, the record shows that Mexico has taken numerous positive steps to address the rights of homosexuals, including legalizing gay marriage in Mexico City and prosecuting human rights violations against homosexuals.

Bringas offers no evidence showing that there has been a change in conditions in Mexico since we decided *Castro-Martinez*. Accordingly, we are bound by our holding in *Castro-Martinez*, and the BIA's determination that no pattern or practice of persecution exists is supported by substantial evidence.[9]

---

[9] Bringas argues that the BIA applied the wrong standard to his pattern-or-practice claim because it cited to withholding cases in discussing the asylum claim. But, as the government noted and as Bringas acknowledges in his reply, the withholding and asylum standards do not differ in any relevant respect as to his pattern-or-practice claim.

### 2. Singled Out for Persecution as a Member of a Disfavored Group

Even without evidence of a pattern or practice of persecution, Bringas could still establish a well-founded fear if he could demonstrate a particularized risk that he will be singled out for persecution if returned to Mexico. Bringas argues that he has been singled out in the past for mistreatment for his membership in the disfavored group of homosexual men, so he "has a 'strong' individualized risk of future harm." The government argues that Bringas forfeited this claim when he failed to raise it before the BIA. We agree that Bringas failed to exhaust this argument before the BIA.

Bringas failed to argue that he would be singled out for persecution as a member of a disfavored group in his brief to the BIA.[10] He consequently has forfeited this claim. *See Abebe v. Mukasey*, 554 F.3d 1203, 1208 (9th Cir. 2009) (en banc) (per curiam) (holding that an alien is "deemed to have exhausted only those issues he raised and argued in his brief before the BIA"); *see also Alvarado v. Holder*, 759 F.3d 1121, 1126 n.4, 1128 (9th Cir. 2014) ("Although [a] petitioner need not . . . raise [his] *precise* argument in

---

[10] In his brief to the BIA, Bringas argued that the IJ erred in failing to find that Bringas had a well-founded fear of persecution, stating that a well-founded fear can be shown by a pattern or practice of persecution. The sections of our cases that he cited concerned only pattern-or-practice evidence. One of the cases he cited, *Wakkary v. Holder*, 558 F.3d 1049, 1061 (9th Cir. 2009), discussed the singled out/disfavored group analysis at length, but not on the page that Bringas cited. He never argued that he would be singled out in the future as a member of a disfavored group. The BIA expressly recognized that Bringas failed to make this argument, observing in a footnote that Bringas "does not argue that his claim falls within the 'disfavored group' analysis espoused by the Ninth Circuit."

administrative proceedings, . . . [he] must specify which issues form the basis of the appeal.") (alterations and emphasis in original) (citations and internal quotation marks omitted). He argues that by raising his similar claim of a pattern or practice of anti-gay persecution, he necessarily exhausted his argument before the BIA. Not so. The pattern or practice argument is separate and distinct from the singled out/disfavored group argument, and we analyze them separately. *E.g.*, *Wakkary v. Holder*, 558 F.3d 1049, 1061–62 (9th Cir. 2009). Unlike the pattern or practice analysis, the singled out/disfavored group analysis requires proof of an individualized risk of harm. *See* 8 C.F.R. § 1208.13(b)(2)(iii); *see also Castro-Martinez*, 674 F.3d at 1082; *Wakkary*, 558 F.3d at 1060–62; *Sael*, 386 F.3d at 925.

Our holding in *Castro-Martinez* forecloses Bringas's "pattern or practice of persecution" argument, and he failed to exhaust his argument that he will be "singled out" as a member of a "disfavored group." Bringas has not demonstrated a well-founded fear of future persecution, and, accordingly, we deny the petition with respect to asylum and withholding of removal.

III

Bringas's claim under the CAT fails because he did not show that he would more likely than not be tortured by or with the acquiescence of the Mexican government if he is removed to Mexico. *See Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014). "To qualify for CAT relief, an alien must establish that 'it is more likely than not that he . . . would be tortured if removed to the proposed country of removal.'" *Id.* at 1033 (quoting 8 C.F.R. § 208.16(c)(2)). The BIA found "no clear error in the [IJ's] determination that

[Bringas] did not demonstrate that he will more likely than not be tortured in Mexico by or with the acquiescence . . . of an official of the Mexican government."

Even if Bringas's past experiences constituted torture, the BIA is not required "to presume that [he] would be tortured again because of his own credible testimony that he had been subjected to torture as a . . . child." *Konou v. Holder*, 750 F.3d 1120, 1125 (9th Cir. 2014). This is especially true where "the factors that precipitated [Bringas's] mistreatment as a child would be less relevant to a 'selfsufficient homosexual adult.'" *Id.* at 1126. Here, the IJ determined that Bringas could likely relocate to a different part of Mexico, such as Mexico City, where the population appears more accepting of gays, and the IJ noted the complete lack of evidence indicating that the Mexican government was aware of any torture taking place. The IJ concluded that Bringas's reports showing "instances of mistreatment of homosexuals in Mexico" were not "sufficient to establish the burden of proof requirement of a more likely than not possibility of torture." The same evidence that supported the BIA's dismissal of the pattern-or-practice claim also supports the IJ's and BIA's conclusions that Bringas failed to establish a likelihood of torture: Conditions in Mexico are insufficiently dangerous for gay people to constitute a likelihood of government-initiated or -sanctioned torture. *See Castro-Martinez*, 674 F.3d at 1082. And because substantial evidence supported the BIA's denial of CAT relief, we deny Bringas's petition with respect to his claim under the CAT.

## IV

Finally, the BIA did not abuse its discretion in finding that Bringas's HIV diagnosis, standing alone, does not require

a remand to the IJ.  In Bringas's brief to the BIA, he moved to remand the case because, not long after the IJ's decision issued, he discovered that he is HIV positive.  The BIA denied his motion to remand.

Denials of motions to remand are reviewed for abuse of discretion. *Malhi v. I.N.S.*, 336 F.3d 989, 993 (9th Cir. 2003). "The BIA abuses its discretion if its decision is 'arbitrary, irrational, or contrary to law.'"  *Romero-Ruiz v. Mukasey*, 538 F.3d 1057, 1062 (9th Cir. 2008) (quoting *Lopez–Galarza v. I.N.S.*, 99 F.3d 954, 960 (9th Cir. 1996)); *Konstantinova v. I.N.S.*, 195 F.3d 528, 529 (9th Cir. 1999) ("The BIA abuses its discretion when it fails to offer a reasoned explanation for its decision, distorts or disregards important aspects of the alien's claim.").

The BIA gave a rational explanation for its denial of Bringas's motion to remand based on his HIV diagnosis.  In requesting a remand, Bringas merely noted in one short paragraph at the end of his brief to the BIA that his diagnosis is a "significant [fact] because it now places [him] in a more vulnerable position should he be returned to Mexico."  The BIA rejected this argument because Bringas did not provide "any additional country conditions evidence or specific arguments regarding how his status as an HIV positive homosexual changes the outcome of his case."  The BIA also noted that the lack of access to HIV drugs is a problem suffered not only by homosexuals but by the Mexican population as a whole. *See Castro-Martinez*, 674 F.3d at 1082.  Because the BIA offered a reasoned explanation and its decision was neither arbitrary nor irrational, we hold that the BIA did not abuse its discretion in denying Bringas's motion to remand.

V

In sum, we hold that substantial evidence supported the BIA's denial of Bringas's claims for asylum, withholding of removal, and relief under the CAT. We also conclude that the BIA did not abuse its discretion in denying Bringas's motion to remand.

Concurrently, we grant the motion of the Public Law Center, Lambda Legal Defense and Education Fund, the National Immigrant Justice Center, the Center for HIV Law and Policy, HIV Law Project, Immigration Equality, Disability Rights Legal Center, and the Asian & Pacific Islander Wellness Center to file a brief as *Amici Curiae* in support of Bringas. We deny Bringas's motion to take judicial notice of facts beyond the administrative record. *See* 8 U.S.C. § 1252(b)(4)(A); *Singh v. Ashcroft*, 393 F.3d 903, 905–06 (9th Cir. 2004).

**PETITION DENIED.**

W. FLETCHER, Circuit Judge, dissenting:

Carlos Bringas-Rodriguez, a Mexican national, testified credibly that throughout his childhood in the town of Tres Valles in the state of Veracruz he was sexually abused by his uncle, his cousins, and a neighbor. His abusers told him they were abusing him because he was gay, and they referred to him using homophobic slurs. His abusers also punched him and beat him, and they threatened to hurt him and his grandmother if he told anyone about the abuse.

Bringas-Rodriguez left Mexico twice. The first time, he came to the United States at age twelve and lived briefly with his mother and step-father in Kansas. While he was in Kansas, some of his gay Mexican friends told him that they had reported similar abuse to Mexican police officers but that the officers had laughed at them, refused to provide help, and told them they deserved the abuse they received. The second time, he came to the United States at age fourteen. He has not returned to Mexico.

Bringas-Rodriguez never reported to Mexican police the abuse he suffered. He testified credibly before the Immigration Judge ("IJ") that he did not do so because he believed a report would be pointless.

The panel majority denies Bringas-Rodriguez's asylum claim. The majority relies primarily on *Castro-Martinez v. Holder*, 674 F.3d 1073 (9th Cir. 2011), a decision in which we denied a similar asylum claim. But *Castro-Martinez* was a carefully circumscribed decision. In *Castro-Martinez* we stated that, even if a petitioner himself had not reported abuse, asylum could be warranted if the petitioner showed that Mexican officials were unwilling to help other gay victims of abuse.

I have growing doubts about the correctness of *Castro-Martinez*, an opinion with which I agreed when it was issued. However, even to the extent *Castro-Martinez* should remain the law of this circuit, I respectfully dissent from the panel's conclusion that it forecloses relief in this case.

### I.  Past Persecution in Mexico

Carlos Bringas-Rodriguez began to realize his same-sex attractions when he was six.  As early as ten years old, he considered himself gay.  As a child, Bringas-Rodriguez was physically abused by his father, who told him, "Act like a boy, you're not a woman."  His father abused Bringas-Rodriguez's mother and siblings as well, but he abused Bringas-Rodriguez the most because he was "different."

Bringas-Rodriguez was also abused and raped by an uncle, his cousins, and a neighbor.  Bringas-Rodriguez's uncle began to sexually abuse him when he was just four years old, and his uncle abused him every two or three months thereafter. After Bringas-Rodriguez turned seven, his cousins sexually abused him on a monthly basis.  Bringas-Rodriguez's uncle, cousins, and a neighbor raped him at home when his mother was not there, and sometimes dragged him into nearby bushes in the neighborhood.  Bringas-Rodriguez's abusers told him that they would hurt him and his grandmother if he told anyone, and, on a few occasions, they punched him.  On one occasion, when Bringas-Rodriguez resisted one cousin's attempt to rape him, the cousin beat him severely.

When Bringas-Rodriguez was eight, his uncle told him that the reason for the ongoing abuse was Bringas-Rodriguez's sexuality.  His uncle was not alone in his anti-gay views.  Bringas-Rodriguez testified, "[my abusers] never called me by my name but called me fag, fucking faggot, queer and laughed about it."

Bringas-Rodriguez first came to the United States in 2002, when he was twelve.  He lived in Kansas with his

mother and step-father for five months, and continued to hide his sexuality and history of sexual abuse. When Bringas-Rodriguez returned to Mexico to live with his grandmother after his stay in Kansas, the abuse resumed unabated. Bringas-Rodriguez's uncle sexually abused him again. Bringas-Rodriguez's cousins referred to him as their "sex toy" and resumed their abuse. A neighbor raped him. The neighbor's assault left Bringas-Rodriguez with bruises all over his body. Because of the continuing abuse and rape, Bringas-Rodriguez fled Mexico, returning to the United States in 2004 at age fourteen.

Bringas-Rodriguez never told the Mexican police about the abuse he had suffered. Even though he wanted protection from his abusers, Bringas-Rodriguez believed any complaints to the police would have been futile. He testified before the IJ that, while he was living in Kansas, two Mexican gay friends "told me that they got raped, they got beat up, like abuse, and they went to the police and they didn't do anything. They even laugh [in] their faces." In a declaration submitted to the Immigration Court, Bringas-Rodriguez wrote that he feared that the Mexican police "would laugh at me and tell me I deserved what I got because I was gay. This happened to friends of mine in Veracruz."

## II. Persecution the Government is Unable or Unwilling to Control

To establish his eligibility for asylum, Bringas-Rodriguez "must demonstrate that he is unable or unwilling to return to his home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or a political opinion." *Castro-Martinez*, 674 F.3d at 1080 (citing 8 U.S.C.

§ 1101(a)(42)(A)).  Bringas-Rodriguez must also show the harm was "inflicted either by the government or by individuals or groups the government is unable or unwilling to control."  *Id.*

A.  Persecution on the Basis of a Protected Ground

We have held that gay men in Mexico "can constitute a social group for the purpose of an asylum claim."  *Id.*; *see also Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1087–89 (9th Cir. 2005).  Undisputed evidence in the record shows that Bringas-Rodriguez was abused, over a sustained period, for being gay.  Bringas-Rodriguez testified that his uncle told him he was being abused because he was gay.  Bringas-Rodriguez also testified that his uncle, cousins, and neighbor "never called me by my name but called me fag, fucking faggot, queer and laughed about it."  Every person who abused Bringas-Rodriguez throughout his childhood either told him that he was being abused for being gay or referred to him using homophobic slurs.

B.  Government Unable or Unwilling to Control the Harm

The question at the heart of this case is thus not whether Bringas-Rodriguez was abused because he was gay.  Rather, it is whether Bringas-Rodriguez can show that the Mexican government was unable or unwilling to control his abusers. I agree with the panel majority that this question is currently controlled by *Castro-Martinez*, an opinion I joined four years ago.  But I part ways with the majority as to the meaning and application of *Castro-Martinez*.

In *Castro-Martinez*, we discussed different methods by which an asylum seeker could demonstrate a government's

inability or unwillingness to control harm inflicted by private parties. For example, we stated that "the BIA may consider whether the victim reported the attacks to the police." *Castro-Martinez*, 674 F.3d at 1080. While such a report can suffice to demonstrate a government's unwillingness to control the persecution, a report is not necessary. "We have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now." *Id.* at 1081. But if the victim does not report to the police, there is a "gap in proof about how the government would have responded." *Id.* (alterations omitted) (quoting *Rahimzadeh v. Holder*, 613 F.3d 916, 922 (9th Cir. 2010)). In such cases, the petitioner bears the burden of filling that gap. *Id.*

We were careful in *Castro-Martinez* to list "other avenues" through which a petitioner could carry this burden. *Id.* Specifically, we identified four additional ways in which an asylum seeker like Bringas-Rodriguez could show that his government was unwilling or unable to prevent persecution by non-governmental parties. He could:

> 1. "establish[] that private persecution of a particular sort is widespread and well-known but not controlled by the government";
>
> 2. "show[] that others have made reports of similar incidents to no avail";
>
> 3. "demonstrat[e] that a country's laws or customs effectively deprive the petitioner of any meaningful recourse to governmental protection"; or

4.  "convincingly establish that going to the authorities would have been futile or would have subjected the individual to further abuse."

*Id.* at 1081 (alterations omitted) (quoting *Rahimzadeh*, 613 F.3d at 921–22). After reviewing the facts in *Castro-Martinez*, we concluded that the petitioner did not present sufficient evidence to show that Mexican officials would have been unable or unwilling to prevent his abuse. *Id.*

The panel majority here concludes that *Castro-Martinez* compels denial of Bringas-Rodriguez's petition because "[t]he facts in Bringas's case are very similar to those in *Castro-Martinez*." Op. at 11. The facts are similar in one respect. In both cases, petitioners introduced United States State Department country reports describing police violence against homosexuals. In *Castro-Martinez*, the petitioner "submitted country reports documenting societal discrimination against homosexuals in Mexico and attacks on gay men committed by private parties." 674 F.3d at 1079. "He also presented evidence of widespread police corruption in Mexico and incidents of police violence against homosexuals." *Id.* We concluded that these reports, without more, did not "compel the conclusion that the police would have disregarded or harmed a male child who reported being the victim of homosexual rape by another male." *Id.* at 1081.

In the case now before us, Bringas-Rodriguez submitted similar country reports. Because Bringas-Rodriguez left Mexico in 2004 and has not returned since, the relevant period for purposes of our analysis is the years before 2004. Bringas-Rodriguez submitted country reports from 2009 and 2010. Although the 2009 and 2010 reports post-date the

period at issue in this case, they provide probative information. Both country reports state that in Mexico discrimination and persecution based on sexual orientation — including discrimination and persecution by governmental officials — had lessened over time. But they also state that discrimination and persecution remained serious problems, five and six years after Bringas-Rodriguez left the country.

The 2009 country report states, "While homosexual conduct experienced growing social acceptance, the National Center to Prevent and Control HIV/AIDS stated that discrimination persisted." The 2010 country report similarly notes that, according to a governmental agency and a nonprofit organization, "societal discrimination based on sexual orientation" remained "common." The 2009 report continues:

> One of the most prominent cases of discrimination and violence against gay men was that of Agustin Humberto Estrada Negrete, a teacher and gay activist from Ecatepec, Mexico State. In 2007 he participated in a gay rights march wearing a dress and high heels. According to the NGO Asilegal, soon after the march, Estrada began receiving threatening telephone calls and verbal and physical attacks. In 2008 he was fired from the school for children with disabilities where he worked. After his dismissal, he and a group of supporters began lobbying the government to reinstate him; *when they went to the governor's palace to attend a meeting with state officials in May, police beat him and his supporters. The next*

*day he was taken to prison, threatened, and raped. Although he was released, Estrada continued to face harassment by state authorities.*

(Emphasis added.) Through these reports, Bringas-Rodriguez established that government discrimination on the basis of sexuality in Mexico persisted, even years after he fled the country.

While Castro-Martinez and Bringas-Rodriguez both produced relevant country reports detailing the Mexican government's continued discrimination against homosexuals, the facts of their cases are dissimilar in a critical respect. Unlike Castro-Martinez, Bringas-Rodriguez provided evidence that "others have made reports of similar incidents to no avail." *Castro-Martinez*, 674 F.3d at 1081. Specifically, Bringas-Rodriguez presented evidence that while living in Kansas, gay Mexican friends told him they had reported similar sexual abuse and that the Mexican police in Veracruz had refused to take action. Bringas-Rodriguez's oral testimony was brief, but quite clear:

> Q: You can go tell police if you return to Mexico and suffer abuse, you could tell the police. . . . Couldn't you do that?
>
> A: They will do nothing.
>
> Q: How do you know that?
>
> A: I know that because when I was living in Kansas, couple of my friends told me that they got raped, they got beat up, like abuse,

and they went to the police and they didn't do
anything.  They even laugh [in] their faces.

Bringas-Rodriguez provided similar testimony in his written
declaration, explaining that, if he reported his abuse, the
police "would laugh at me and tell me I deserved what I got
because I was gay.  This happened to friends of mine in
Veracruz."

Neither the BIA nor the IJ mentioned Bringas-
Rodriguez's testimony about what his friends had told him.
In fact, the IJ, whose decision the BIA affirmed, stated in
denying asylum that "we certainly do not have any evidence
whatsoever" that Mexican authorities were unwilling to
protect a child like Bringas-Rodriguez.  The IJ's statement is
wrong.  It is undisputed that Bringas-Rodriguez submitted
probative country reports, and that he provided both oral and
written testimony that his friends had reported similar sexual
abuse to police in Veracruz, and the police refused to take
action.

Despite this evidence, the panel majority rejects Bringas-
Rodriguez's asylum claim.  To rebut Bringas-Rodriguez's
country reports, the majority asserts that governmental
discrimination on the basis of sexual orientation in Mexico
has lessened in recent years.  Op. at 13.  Although the
relevant time period for purposes of Bringas-Rodriguez's
claim is before 2004, the majority cites evidence from the
past few years, even citing a report published only this year.
Op. at 14 n.5.  This evidence has limited utility.  We
recognized in a recently published opinion that while Mexico
has made some advances in its treatment of homosexuals,
there has actually been "an *increase* in violence against gay,
lesbian, and transgender individuals during the years in which

greater legal protections have been extended to these communities" and that "there is a continued failure to prosecute the perpetrators of homophobic hate crimes throughout Mexico." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1081–82 (9th Cir. 2015) (emphasis in original).

The panel majority then concludes that Bringas-Rodriguez's additional evidence — the statements of his friends — is also not sufficient. The majority's primary complaint is that the evidence lacks specificity. Op. at 15. To support this conclusion, the majority lists a number of details that, in its view, are crucially absent from Bringas-Rodriguez's testimony. These details include the names of his two friends, their ages, "the nature of their relationship to Bringas," "how or to whom they reported their abuse," or "any evidence showing that these nameless friends actually reported any abuse to the Mexican authorities." Op. at 15. But Bringas-Rodriguez did provide a number of these details. Bringas-Rodriguez explained the nature of the relationship: they were his Mexican friends who had recounted to him in Kansas their experience in Veracruz. While he did not state their exact ages, a reasonable inference, given that they were his friends, is that they were his age contemporaries. He also testified as to whom the friends had reported their abuse: Mexican police in Veracruz. Finally, he provided evidence that the friends had made the reports: his credible testimony about what they had told him.

The panel majority also partially discounts the statements of Bringas-Rodriguez's friends because they are hearsay. Op. at 12, 16–17. However, it is well established in our case law that hearsay — even hearsay upon hearsay — is proper evidence in asylum proceedings. *Ramirez-Alejandre v.*

*Ashcroft*, 319 F.3d 365, 370 (9th Cir. 2003) (en banc). Hearsay is sometimes (though only sometimes) less probative and reliable than direct evidence. But because of the particular difficulties asylum seekers have in obtaining direct evidence, we are more willing to credit hearsay in asylum cases than in conventional litigation. *See*, *e.g.*, *Cordon-Garcia v. I.N.S.*, 204 F.3d 985, 992–93 (9th Cir. 2000) (holding "Petitioner's testimonial evidence," which consisted of "hearsay, and, at times, hearsay upon hearsay," sufficient to support the presumption that petitioner had a well-founded fear of future persecution).

The majority also suggests that Bringas-Rodriguez's testimony is suspect because much, perhaps all, of the abuse Bringas-Rodriguez suffered had already taken place by the time he talked to his friends in Kansas. *See* Op. at 12 n.4. But this is irrelevant. The question at issue is not what Bringas-Rodriguez knew about the police when he was a child. Rather, the question is whether the Mexican police would have helped Bringas-Rodriguez if he had reported his abuse to them. An asylum seeker can present probative evidence that he or she obtained only after escaping from persecution. *See*, *e.g.*, *Cordon-Garcia*, 204 F.3d at 992–93 (relying upon petitioner's evidence, obtained only after the petitioner departed her home country, to find that petitioner established a well-founded fear of future persecution); *Gjerazi v. Gonzales*, 435 F.3d 800, 809 (7th Cir. 2006) (holding the IJ erred in excluding documentary evidence of persecution solely because the evidence was only acquired after the petitioner arrived in the United States).

Finally, the majority makes geographic objections to Bringas-Rodriguez's evidence. For example, it discounts Bringas-Rodriguez's country reports because neither report

"mentions any instances of discrimination or persecution in his home state of Veracruz." Op. at 13. This objection ignores the fact that Bringas-Rodriguez's additional evidence — the statements of his friends about their experiences in Veracruz — corroborates the country reports and demonstrates that discrimination against homosexuals extends to Bringas-Rodriguez's home state. Similarly, the majority objects that Bringas-Rodriguez's evidence does not discuss "the specific police practices in Bringas's town of Tres Valles." Op. at 15. But Tres Valles is in the state of Veracruz. Our Court has "adjusted the evidentiary requirements" for asylum seekers in light of "the serious difficulty with which asylum applicants are faced in their attempts to prove persecution." *Malty v. Ashcroft*, 381 F.3d 942, 947 (9th Cir. 2004) (quoting *Cordon-Garcia*, 204 F.3d at 993). Accordingly, we do not require a petitioner to provide evidence of the specific practices of his hometown when he presents evidence of statewide or even countrywide persecution. *See, e.g.*, *Yan Rong Zhao v. Holder*, 728 F.3d 1144, 1147–48 (9th Cir. 2013) (finding the BIA erred in requiring a Chinese petitioner to provide evidence of the government policy in her town and noting that "[n]either the BIA nor this court has previously required municipal-level proof when the petitioner presents province-level proof").

In sum, we wrote in *Castro-Martinez* that a gay petitioner qualifies for asylum when he provides country reports documenting official persecution on account of sexual orientation, supplemented by evidence that "others have made reports of similar incidents to no avail." 674 F.3d at 1081. We denied relief in *Castro-Martinez* because the petitioner had not, in the view of the panel, provided such supplemental evidence. In this case, Bringas-Rodriguez has provided the additional evidence that was lacking in *Castro-Martinez*. He

testified that his Mexican friends ("others") had told police in his home state of Veracruz that they were abused because of their sexuality ("had made reports of similar incidents") and that the police did nothing ("to no avail").

## III.  Revisiting *Castro-Martinez*

As noted above, I have growing doubts about our decision in *Castro-Martinez*.  As the panel majority writes, the facts of *Castro-Martinez* resemble this case.  In both cases, a gay, HIV-positive man sought asylum based on a long history of childhood abuse suffered in Mexico because of his sexuality. *Id.* at 1078–79.  Both victims failed to report their abuse to Mexican officials.  *Id.* at 1080.  And both victims provided country reports describing anti-gay sentiments and persecution by Mexican authorities.  The BIA denied asylum in both cases, on the ground that the victims failed to show that the Mexican government was unable or unwilling to control the abusers.  *Id.* at 1081.

We denied Castro-Martinez's petition for review.  We concluded that there was "no evidence in the record that Mexican authorities would have ignored the rape of a young child or that authorities were unable to provide a child protection against rape."  *Id.*  We wrote that Castro-Martinez offered nothing more than his belief that "the police would not have helped him."  *Id.*  "[S]uch a statement, without more, is not sufficient to fill the gaps in the record regarding how the Mexican government would have responded had Castro reported his attacks."  *Id.*

If the only evidence Castro-Martinez offered had been his unsupported belief, I would continue to think our decision in that case was correct.  Asylum seekers must show that "the

government concerned was either unwilling or unable to control the persecuting individual or group." *Matter of Pierre*, 15 I. & N. Dec. 461, 462 (BIA 1975). Unsubstantiated assertions that the government is unwilling or unable to control a persecutor do not suffice to carry that burden.

Castro-Martinez, however, did offer evidence to show Mexican officials would not have helped him. As we wrote in our opinion, "Castro also stated that he was afraid of contacting the police because they would likely abuse him on account of his homosexuality. Castro presented country reports documenting police corruption and participation in torture, abuse, and trafficking, as well as incidents of police harassment of gay men." *Castro-Martinez*, 674 F.3d at 1081. Despite this, we held that Castro-Martinez still had not carried his burden because "none of these reports compel the conclusion that the police would have disregarded or harmed a male child who reported being the victim of homosexual rape by another male." *Id.*

I have come to believe that *Castro-Martinez* demands an unwarranted level of specificity from country reports. In rejecting Castro-Martinez's claim, we held that statements in country reports that Mexican police harassed homosexuals and ignored their claims of abuse was not enough. We required, instead, a statement in the report focusing specifically on gay children — a statement that Mexican police ignored reports by gay male children who were abused by other males. The panel majority here does the same. It discounts Bringas-Rodriguez's evidence of governmental discrimination against homosexuals generally, and instead affirms the IJ's conclusion that Bringas-Rodriguez failed to provide evidence showing that the Mexican government

would not have responded to "*the abuse of children*." Op. at 13–14, 18 (emphasis in original).

Given the nature of crimes of sexual violence against children and the difficulty children face in reporting them, *Castro-Martinez* and the panel majority require evidence that few victims can supply. Many children will not report these crimes for some of the same reasons Bringas-Rodriguez did not. Abusers often threaten their victims with harm if they tell anyone, and they sometimes make good on those threats. Children also have difficulty getting information to the police, especially if family members or neighbors — the people who might report the abuse — are the abusers. By discounting country reports that describe discrimination against homosexuals generally and instead requiring reports specifically addressing gay children, *Castro-Martinez* effectively requires abused children to report to the police, either to provide relevant evidence for the country reports or to establish the requisites for asylum in their own cases.

Conclusion

We have repeatedly held that victims, especially child victims, of private persecution need not report their abuse to obtain asylum. *Castro-Martinez*, 674 F.3d at 1081 ("We have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now."); *Rahimzadeh*, 613 F.3d at 921 ("The reporting of private persecution to the authorities is not . . . an essential requirement for establishing government unwillingness or inability to control attackers."); *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1057 (9th Cir. 2006). Yet, *Castro-Martinez* and today's decision effectively require just that. In *Castro-Martinez*, by demanding unrealistic specificity from country

reports, we effectively eliminated those reports as a method of showing a foreign government's inability or unwillingness to prevent sexual abuse of gay children. In today's opinion, we effectively eliminate another avenue for obtaining relief. In *Castro-Martinez*, we wrote that evidence that "others have made reports of similar incidents to no avail" could be used to show a government's inability or unwillingness to prevent private harm. Bringas-Rodriguez presented precisely such evidence, and he presented it in the only form — hearsay — likely to be available to someone in his position.

Bringas-Rodriguez, like most abused children, did not report to the police the sexual abuse he suffered. Thus, when seeking aslyum, Bringas-Rodriguez had to rely on other evidence of the Mexican government's inability or unwillingness to protect him. He provided 2009 and 2010 country reports describing police indifference to, and participation in, discrimination and violence against homosexuals. He also testified that his gay friends told him that when they reported to the Mexican police in his home state of Veracruz similar abuse they had suffered, the police laughed in their faces and told them that they deserved the abuse they were receiving. That should be enough.

I respectfully dissent.